733 P.2d 1073

**Jack Randy HAWKINS and Cynthia Hawkins, husband and wife, Plaintiffs-Appellants,**

v.

**ALLSTATE INSURANCE COMPANY, a foreign corporation, and Does I through V, Defendant-Appellee.**

No. CV–86–0010–PR.

Supreme Court of Arizona.

Feb. 26, 1987.

As Amended March 4, 1987.

Reconsideration Denied April 7, 1987.

Thur, Dawson & O'Sullivan by Calvin C. Thur, Scottsdale, for plaintiffs-appellants.

Harrison & Lerch, P.C. by Mark I. Harrison, Douglas L. Christian, Phoenix, for defendant-appellee Allstate Insurance Company.

GORDON, Chief Justice.

Jack and Cynthia Hawkins (Hawkins) petitioned this court to review a decision of the court of appeals reversing the trial court's grant of a motion for judgment notwithstanding the verdict in favor of Allstate Insurance Company (Allstate) and affirming the trial court's grant of Allstate's motion for a new trial. *Hawkins v. Allstate Insurance Company*, No. 1 CA–CIV 6881 (Ariz.Ct.App. filed Aug. 13, 1985). We granted review to determine the admissibility of an insurer's past claims practices and policies and to examine the quantum of proof necessary to sustain an award of punitive damages. Rule 23, Ariz.R.Civ. App.P., 17A A.R.S. In its supplemental brief, Allstate questioned the constitutionality of the manner by which punitive damages are imposed. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## I. FACTS

In July 1979, the Hawkins purchased a new Chevrolet Monte Carlo, loaded with options, for approximately $8,000. Five months after purchasing the Monte Carlo, Cynthia Hawkins was involved in an automobile accident that virtually demolished the car.

The Hawkins were insured by Allstate under a standard automobile liability policy. That policy included a collision provision limiting Allstate's liability to either paying the actual cash value of the car at the time of the loss or to replacing the car with one of like kind and quality.

The Hawkins reported the accident to Allstate the day it happened, December 6, 1979. Within a few days, Allstate classified the car as a "total loss" after determining that the actual cash value of the car was less than the estimated repair cost. The Hawkins' claim was transferred to a total loss adjuster, Paul Schwenk.

According to Allstate's witnesses, the actual cash value of a car is its market value. To determine actual cash value, Allstate's total loss adjusters first establish a guide book value by calculating the high retail

Blue Book value of the car and its optional equipment minus deductions for the car's condition immediately prior to the loss. Such deductions represent amounts needed to bring the car to average retail condition and include deductions for the condition of the exterior of the car, paint, bumpers, upholstery, glass, tires, and clean up. The adjusters then perform a "market verification" by asking three or four local dealerships to estimate the insured car's worth and sometimes by checking the selling price of similar cars advertised in local car magazines. From the range of values resulting from this procedure, Allstate's adjusters determine a specific dollar amount as the actual cash value, apparently relying most heavily on the low estimates received from local dealerships.

In the Hawkins' case, Schwenk determined that the Blue Book value of the Hawkins' car was $6,545. Schwenk did not examine the car and failed to consider many of the accessories on the insured car. From this figure, Schwenk deducted a $35 clean-up fee, which resulted in a guide book value of $6,510. Four dealer estimates of the value of a similar car ranged from $6,150 to $6,300. These estimates were based on Schwenk's description of the car and did not reflect all the options on the insured car. The actual cash value recorded in the Hawkins' claim file was $6,165 and was accompanied by the following explanation:

> Dealers have replacements, similar equipment but more miles; say one like this worth $6,200. Deduction for reconditioning. ACV $6,165.

Schwenk first contacted the Hawkins on December 13, 1979, one week after the accident. At that time, the Hawkins requested that Allstate provide them with a replacement car, rather than a sum of money equal to the actual cash value of their "totalled" car. Schwenk sent them to look at four similar Monte Carlos at a local dealership. Schwenk would not let the Hawkins have the car they selected because it was $300 more than Allstate was

willing to pay.[1] Instead, Schwenk selected one of the other cars and insisted that the Hawkins take it. The Hawkins refused because the car Schwenk selected had few of the options their insured car had and was not comparable in either quality or gas mileage.

Four days after Schwenk rejected the car the Hawkins selected as a replacement, Schwenk told the Hawkins he would pay them $4,500 in cash unless they took the car he had selected. The Hawkins refused, explaining that they had paid over $8,000 for their car five months earlier and could not purchase a comparable car for $4,500. Later, during the same conversation, Schwenk threatened to deliver a check for $5,000.

By December 20, the Hawkins, desperate for a car, accepted a check for $6,471, payable to Hawkins and a local dealership, to purchase the car Schwenk had selected. It had been approximately a week since the Hawkins viewed the car, and when Jack Hawkins went to pick up the car, he again realized the cars were not comparable and called Schwenk from the dealership to tell him he did not want the car. After a lengthy, heated discussion and assurances from Schwenk that the replacement car would be brought up to the insured car's standards after the holidays, Jack Hawkins reluctantly gave the check to the dealer.

The replacement car lacked power windows, had a larger engine and got worse gas mileage, had dealer-installed (not factory-installed) cruise control, and lacked several styling features of the original car. After the holidays, Allstate sent an additional $125 to the Hawkins to install power windows, but the Hawkins were unable to get the work done for less than $600. Allstate refused to make any other adjustments and closed the file. Although no evidence of the replacement vehicle's actual cash value was presented, Allstate conceded on appeal that the list price of the replacement vehicle was at least $161.45 less than that of the insured car.

The Hawkins sued Allstate for fraud and bad faith. At trial, three former Allstate employees testified about Allstate's claims procedures and practices. None had any direct experience with the Hawkins' claim. In addition, Schwenk and his supervisor testified.

The trial judge directed a verdict in favor of Allstate on the fraud count but submitted the bad faith claim to the jury to consider liability for both compensatory and punitive damages. The jury awarded the Hawkins $15,000 compensatory damages and $3.5 million punitive damages. The trial court subsequently granted Allstate's motion for judgment notwithstanding the verdict on the ground that the evidence presented at trial was insufficient to sustain the verdict. In the alternative, the trial court granted Allstate's motion for a new trial on five grounds. The court of appeals held that the trial court erred in entering a judgment notwithstanding the verdict, but affirmed the grant of a new trial for two reasons: 1) the testimony of a former Allstate claims adjuster was improperly admitted, and 2) the amount of the punitive damages award was not justified by the evidence.[2] *Hawkins*, slip op. at 11, 16.

## II. ADMISSIBILITY OF INSURER'S PAST CLAIMS PRACTICES

During trial, Hawkins called three former Allstate employees to testify about Allstate's procedures for handling total loss claims. Over Allstate's objection on the grounds of relevancy, each testified concerning Allstate's method of determining the amount of an insured's loss (the actual cash value of the property) and general company policies regarding claims handling.

---

**1.** The evidence is conflicting whether the car the Hawkins selected was $300 more than the actual cash value of their insured car or $300 more than one of the remaining three cars.

**2.** The Hawkins abandoned their appeal from the directed verdict on the fraud count. *Hawkins*, slip op. at 4.

One former claims representative, Pat Paterno, testified about Allstate's claims practices in the Phoenix office at the time the Hawkins claim was processed. Although she did not work on the Hawkins claim, Paterno testified that as a claims representative Allstate instructed her to automatically make certain deductions in determining a car's actual cash value. Specifically, she testified that adjusters were instructed to deduct an extra $5 for tire wear and *always* to deduct a $35 cleaning fee, regardless of the car's cleanliness. She testified that her supervisors explained that a $5 deduction "wouldn't mean much to an insured or claimant, but $5 on every claim would mean a lot to the company."

Another former claims representative, Jan Mauritz, was employed by Allstate in Tacoma, Washington from 1978 to 1981. Like Paterno, Mauritz testified that he was instructed automatically to make certain deductions, including a cleaning fee, in valuing a "total loss." He testified that he was instructed to offer an insured the lowest value of a claim because the insured probably would take it in order to get his car fixed quickly. He also testified that Allstate used the adjusters' "severity rating," a ratio of total dollars paid out in claims over the number of claims, to evaluate adjusters' performance and promotion potential. Mauritz opined that the claims-handling practices and policies to which he testified were followed throughout the company and not merely in the Tacoma office because they were promulgated through corporate literature and policy statements. In his opinion, these practices "may lead to what one may call chiseling, to calculated offers substantially below fair value...."

The third former Allstate employee that testified, William Boettcher, was employed by Allstate as a claims examiner in Phoenix from 1962 to 1964, 15 years before the Hawkins' claim. He testified that he was instructed automatically to take certain deductions on property damage claims, including amounts for tire wear. He also testified as to Allstate's explanation for making the deductions:

Q Was an explanation given as [to] why you should make various deductions?

A Yes, it was.

Q What explanation was given?

A Basically, that particularly in terms of property damage or collision claim, that the owner of the vehicle was concerned whether or not he was going to get his vehicle back, how soon he could get it repaired and so forth. Therefore, he would not perhaps object to some of these small deductions. And you'd be able to settle the claim at a cheaper rate. The statement was frequently made that if you could save one dollar on a million claims, you would save the company as much as a million dollars.

Boettcher testified that he heard this explanation from instructors at an Allstate regional claims school, which he attended for approximately 2 weeks in 1962, from regional claims supervisors, and from his local assistant manager in the Phoenix office.

Boettcher testified that both the local and regional claims supervisors' general policy was to settle claims for as low an amount as possible. He also testified about the function of the claims department during his employment: "In general terms, I'd say it was perhaps not to settle claims as much as it was to save the company money, because this would increase their profits."

■ Among other reasons, the trial court granted Allstate's motion for a new trial after deciding it had erred in admitting the testimony of the former Allstate employees. The trial court did not explain the perceived error, but only summarily concluded that the testimony of the three witnesses should not have been admitted.[3]

---

**3.** We take this opportunity to voice our objection to such conclusory rulings because they impair effective appellate review. We urge trial judges to articulate their reasoning so appellate courts can determine on appeal whether the ruling was erroneous.

The court of appeals affirmed the grant of a new trial, but held that the testimony of only one of the former employees, William Boettcher, was erroneously admitted. The appellate court reasoned that Boettcher's testimony was inadmissible under Rule 404(b), Ariz. Rules of Evid., 17A A.R.S.[4] because Allstate did not deny its acts nor claim they were unintentional and because the evidence was irrelevant as the practices Boettcher described were not sufficiently similar to the Hawkins' experience to be admissible to establish a pattern of bad faith to support a punitive damages award.

In light of this procedural history, the issue we address is whether the trial court's admission of Boettcher's testimony was an error that justified granting Allstate's motion for new trial.

The power to grant a new trial is largely within the trial court's discretion, but this power is not unlimited. *King v. Superior Court*, 138 Ariz. 147, 151, 673 P.2d 787, 791 (1983). "[I]f it appears clearly from the record that there was no error in the matters presented in the motion for new trial, it is an abuse of discretion for the court to grant a new trial." *Helena Chem. Co. v. Coury Bros. Ranches*, 126 Ariz. 448, 450, 616 P.2d 908, 910 (App. 1980).

A party cannot urge in a motion for new trial that evidence was erroneously admitted unless a proper objection, stating the specific ground of the objection, was made at the time the evidence was offered, unless the error is fundamental. M. Udall & J. Livermore, *Arizona Law of Evidence*, § 12, at 14 (2d ed. 1982); *see Helena Chem. Co.*, 126 Ariz. at 453, 616 P.2d at 913; Rule 103. At trial, Allstate objected to Boettcher's testimony only on grounds of relevancy.[5] We disagree with the court of appeals

that Boettcher's testimony was erroneously admitted because it was irrelevant.[6]

## A. Relevance

### 1. Rules of Evidence

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401. Relevancy is not an inherent characteristic of proffered evidence; instead, it is the relationship between the proffered evidence and the fact sought to be proved. *See* M. Udall & J. Livermore, *supra*, at 163; 1 Weinstein's Evidence ¶ 401[03], at 401–17 (1986). Essentially, relevancy is a two-part test. First, evidence is relevant only if it relates to a consequential fact; evidence directed to an undisputed issue is irrelevant. What is at issue in a particular case is determined from the pleadings and the substantive law. M. Udall & J. Livermore, *supra*, at 161; Weinstein's Evidence, *supra*, at 401–17 to –19. Second, to be relevant, evidence need only alter the probability, not prove or disprove the existence, of a consequential fact. M. Udall & J. Livermore, *supra*, at 162; Weinstein's Evidence, *supra* ¶ 401[06], at 401–33 to –36. Allstate's liability for both the tort of bad faith and punitive damages was at issue during the trial. Therefore, evidence that tends to establish a prima facie case of bad faith or entitlement to punitive damages is relevant.

#### a. Bad Faith—Prima Facie Case

We recently clarified that tort recovery for bad faith is allowed if an insurer intentionally breaches the implied covenant of good faith and fair dealing in the insurance contract by denying the insured the

---

4. The Rules of Evidence, 17A A.R.S., will be referred to as "Rule _____" throughout this opinion.

5. In pre-trial motions, Allstate also objected to Boettcher's qualifications as an expert, but his testimony was not offered as expert opinion evidence.

6. Allstate's precise objection was that the testimony was "irrelevant and immaterial." Modern rules of evidence capture both concepts in the term "relevance." M. Udall & J. Livermore, *supra* § 81, at 160; Rule 401.

security and protection from calamity that is the object of the insurance relationship. *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565 (1986). To establish a prima facie case of bad faith, Hawkins had to prove that Allstate acted intentionally, not inadvertently or mistakenly, and that Allstate dealt unfairly or dishonestly with the Hawkins' claim or failed to give fair and equal consideration to the Hawkins' interests. *Id.* at 160, 726 P.2d at 576.

### b. Punitive Damages—Prima Facie Case

■ Punitive damages are recoverable in insurance bad faith tort actions only if the insured acted with an "evil mind" in breaching the implied covenant of good faith and fair dealing. *Rawlings,* 151 Ariz. at 162–63, 726 P.2d at 578–79. The requisite evil mind is found if the insurer intended to injure the insured or consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to the insured. *Id.* at 162, 726 P.2d at 578. In addition, the requisite evil mind may be inferred if the insured's conduct is sufficiently "oppressive, outrageous or intolerable." *Id.* at 162–63, 726 P.2d at 578–79.

■ To recover punitive damages, the plaintiff must also introduce sufficient evidence to allow the trier-of-fact to calculate a punitive damage award that is reasonable under the circumstances. *E.g., Nielson v. Flashberg,* 101 Ariz. 335, 341, 419 P.2d 514, 520 (1966). Although a precise laundry list of relevant evidence is impossible, evidence is properly considered by the trier-of-fact in assessing punitive damages if it bears upon the purpose and function of punitive damages. The purpose of punitive damages is not to compensate the plaintiff, but to express society's disapproval of outrageous conduct and to deter such conduct by the defendant and others in the future. *See, e.g., Nielson v. Flashberg,* 101 Ariz. at 341, 419 P.2d at

520; *Acheson v. Shafter,* 107 Ariz. 576, 578, 490 P.2d 832, 834 (1971).

■ One category of relevant evidence is the defendant's financial position. *See, e.g., Acheson v. Shafter,* 107 Ariz. at 578, 490 P.2d at 834 (wealth or financial status of defendant relevant to allow jury to impose an appropriate punishment); *Nielson v. Flashberg,* 101 Ariz. at 341, 419 P.2d at 520. Obviously, the goals of punishment and deterrence would be circumvented if the financial position of the defendant allowed it to comfortably absorb the award.

■ Another category of relevant evidence is the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred, from the defendant's conduct. *See* Mallor & Roberts, *Punitive Damages: Toward a Principled Approach,* 31 Hastings L.J. 639, 667 (1980);[7] Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1257 (1976). The more reprehensible the act and the more severe the resulting harm, the greater the award of punitive damages that is reasonable under the circumstances. The duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, and any concealment of it are elements to consider in judging the reprehensibility of the defendant's conduct. *See Neal v. Farmers Ins. Exchange,* 21 Cal.3d 910, 927, 582 P.2d 980, 990, 148 Cal.Rptr. 389, 399 (1978); *Chodos v. Ins. Co. of North America,* 126 Cal.App.3d 86, 104, 178 Cal.Rptr. 831, 841 (1981); *State ex rel. Young v. Crookham,* 290 Or. 61, 71, 618 P.2d 1268, 1274 (1980).

■ A third relevant consideration is the profitability of the defendant's conduct. *See Cox v. Stolworthy,* 94 Idaho 683, 691, 496 P.2d 682, 690 (1972); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 304, 294 N.W.2d 437, 460 (1980); *Mallor & Roberts, supra,* at 667–68. A punitive damage award that

---

**7.** Although the authors advocate that the judge, not the jury, assess the sum of punitive damages, the evidence discussed here is appropriately considered by the trier-of-fact under Arizona's procedure for imposing punitive damages.

disgorges ill-gotten profits serves to deter future similar conduct by eliminating any profit incentive.

These factors are presented only as guidelines to the character of evidence that is *relevant* to assessing punitive damages and should be viewed as neither exhaustive nor exclusive.[8] Furthermore, it is well settled that not all relevant evidence is admissible and whether such evidence is admissible in a particular case depends upon the circumstances of that case. *See* Rules 402–411.

Thus, to establish a prima facie case for the recovery of punitive damages, Hawkins had to prove that an evil mind—either a desire to harm or conscious disregard of the Hawkins' right to a fair valuation of their property loss—motivated Allstate's bad faith conduct. To recover punitive damages Hawkins also had to establish a factual basis from which the jury could assess a sum of punitive damages that would accomplish the goals of punishment and deterrence.

### 2. Application to Present Case

■ Boettcher's testimony is relevant both to Allstate's liability for the tort of bad faith and punitive damages. *See Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 343, 666 P.2d 83, 88 (App.1983) (evidence of past deceptive sales practices relevant to whether those practices are currently used and to issue of punitive damages). Regarding Allstate's liability for bad faith, Boettcher's testimony is relevant to whether Allstate acted intentionally. Evidence of previous, similar acts alters the probability that the conduct in question was unintentional; the more frequently an act occurs, the more probable it is intentional. Thus, Boettcher's testimony made it more probable that the invalid $35 cleaning fee deduction used in estimating the actual cash value of Hawkins' loss was not mistakenly nor inadvertently made.

More importantly, Boettcher's testimony is relevant both to establish a prima facie

case for recovery of punitive damages and to assess a sum of punitive damages. We note that unless the defendant is willing to take the stand and admit its "evil mind," the plaintiff must prove entitlement to punitive damages with circumstantial evidence. Thus, whether the defendant intended to injure the plaintiff or consciously disregarded the plaintiff's rights may be suggested by a pattern of similar unfair practices. *Colonial Life & Acc. Ins. Co. v. Superior Court*, 31 Cal.3d 785, 792, 647 P.2d 86, 90, 183 Cal.Rptr. 810, 814 (1982); *Moore v. American United Life Ins. Co.*, 150 Cal.App.3d 610, 624–25, 197 Cal.Rptr. 878, 886–87 (1984); *see Rawlings v. Apodaca*, 151 Ariz. at 162–63, 726 P.2d at 578–79 (improper motives may be inferred from sufficiently oppressive, outrageous or intolerable conduct).

■ We disagree with the court of appeals that the practices about which Boettcher testified lacked sufficient similarity to the Hawkins' experience and the other adjusters' testimony to constitute such a pattern. All three former employees described a policy of routine, automatic deductions, regardless of their validity, in valuing an insured's loss. Boettcher's testimony is different because he did not describe the specific cleaning fee deduction testified to by Mauritz and Paterno and included in the actual cash value calculations of the Hawkins' car. This difference is immaterial to the purpose for which the evidence was offered. Boettcher's testimony was offered to show that Allstate engaged in a conscious course of conduct, firmly grounded in corporate policy, which denied Hawkins and countless other insureds the actual cash value of their property. The evidence was not offered to establish any particular conduct regarding the Hawkins' claim. This testimony was offered to explain Allstate's motive or its state of mind when dealing with the Hawkins and other insureds.

---

**8.** Some courts and commentators suggest that the jury consider the plaintiff's litigation expenses in assessing punitive damages. We express no view on this factor in this case.

Boettcher's testimony also is different because he described Allstate's claims procedures and policies 15 years before the Hawkins claim. Allstate argues this time span robs the evidence of its relevance. We disagree. Remoteness in time goes to the weight of the evidence, not its admissibility. *State v. Jeffers*, 135 Ariz. 404, 418, 661 P.2d 1105, 1119, *cert. denied*, 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983). As noted above, relevance requires only a modicum of rationally probative force. While a significant time span may reduce the probative force of evidence, it does not eliminate it.

Clearly, Boettcher's testimony concerning Allstate's past claims practices also was relevant to assessing an appropriate sum of punitive damages. Boettcher's testimony presents direct evidence of the duration of Allstate's misconduct and establishes evidentiary facts from which the jury could determine the reprehensibility of Allstate's conduct. *See ante* 152 Ariz. at 497–498, 733 P.2d at 1080–1081.

Because we find Boettcher's testimony relevant to both the issue of bad faith and punitive damages, we hold that the trial court abused its discretion if it granted a new trial because Boettcher's testimony was not relevant.

### B. Character Evidence

■ We also disagree with the court of appeals that a new trial was justified because Boettcher's testimony was erroneously admitted in violation of Rule 404. Because Allstate did not object to Boettcher's testimony as impermissible character evidence, this error was not preserved as an issue for Allstate's motion for a new trial. M. Udall & J. Livermore, *supra* § 12, at 18; *Grant v. Arizona Public Service Co.*, 133 Ariz. 434, 450, 652 P.2d 507, 523 (1982) (objection that evidence is irrelevant, without specifying how or why, does not raise any issue on appeal where the evidence would have been relevant under any possible circumstance); 1 Weinstein's Evidence ¶ 103[02], at 103–23 to –24 (if a general objection is overruled, party object-ing is precluded from asserting a proper objection on appeal). Therefore, we hold that the trial court abused its discretion if it granted a new trial because Boettcher's testimony was inadmissible character evidence.

■ However, even if the issue was properly preserved, the evidence was not inadmissible pursuant to Rule· 404. Subsection (b) permits evidence of "other crimes, wrongs or acts" if the purpose is to show a party's motive, intent or absence of mistake or accident. These are precisely the purposes for which Boettcher's testimony was admitted. *See ante* at 498–499, 733 P.2d at 1081–1082. We disagree with the court of appeals that Rule 404(b) "is inapplicable." *See Rawlings* 151 Ariz. at 153, 726 P.2d at 569. We interpret the court's statement to mean that because Allstate did not deny its acts nor allege that they were unintentional, the deliberateness of Allstate's conduct was not at issue and Boettcher's testimony was irrelevant because it was not directed to a fact of consequence to the determination of the case. This reasoning ignores that Boettcher's testimony is relevant and admissible to prove Allstate's improper motives for purposes of punitive damages. Furthermore, proof of intentional conduct is necessary to establish a prima facie case of the tort of bad faith. Absent a stipulation by Allstate to this element of the claim, Hawkins was required to put on such proof to survive a directed verdict. Also, when Allstate did present its defense, it took the position that its claims practices were innocent, cost-saving measures taken to prevent overpayment of claims. Certainly, Boettcher's testimony was admissible to rebut this contention.

### C. Unfair Prejudice

■ Allstate also argues that in granting a new trial based on erroneously admitted evidence, the trial court properly exercised its discretion to exclude Boettcher's testimony because the probative force of the evidence was substantially outweighed by the danger of unfair prejudice. *See*

Rule 403. Allstate urges that its objection to the evidence as irrelevant necessarily embodied an objection on grounds of unfair prejudice. This argument finds support in our case law. *See Jones v. Pak-Mor Mfg. Co.*, 145 Ariz. 121, 125, 700 P.2d 819, 823 (question of relevancy looks at whether evidence lacks probative value and whether probativeness is outweighed by danger of prejudice), *cert. denied*, —— U.S. ——, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985). *But see* 1 Weinstein's Evidence ¶ 103[02], at 103–23 (objections pertaining to undue prejudice or impermissible character evidence must be stated specifically and are not raised by "incompetent, irrelevant and immaterial" objection); *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F.2d 814, 823 (1st Cir.1983) (only stated objection was relevancy and court refused to consider prejudicial effect), *cert. denied*, 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231. However, Allstate misperceives the posture of this case on review. The issue is not whether the trial court could have exercised its discretion to exclude Boettcher's testimony as unfairly prejudicial, but whether admitting the testimony was an error that justified a new trial. Because we discern no legal error in the admission of Boettcher's testimony, we hold that the trial court abused its discretion by ordering a new trial on this basis.

### III. PUNITIVE DAMAGE AWARD

The court of appeals reversed the entry of judgment notwithstanding the verdict, holding that Hawkins had established a prima facie case for punitive damages. However, the court affirmed the grant of a new trial because, inter alia, "the amount of punitive damages award was not justified by the evidence." Slip op. at 16. The court considered evidence of Allstate's cor-porate policy to deduct routinely a $35 cleaning fee from the estimated value of a total loss vehicle, as well as Allstate's dealings with the Hawkins, but concluded that the amount of the punitive damages award was improper because there was no proof of the profits made by Allstate from its improper deductions. *See* slip op. at 16 ("Where punitive damages are based on wrongful corporate policies which are profit oriented, the supporting evidence must go far beyond informed speculation."). The court of appeals found the only reference to either the number of total loss claims adjusted by Allstate or the amount of illicit profits was by Hawkins' counsel when he suggested to adjuster Schwenk that if Allstate improperly deducted $35 from 100,000 total loss claims, Allstate would gain $3.5 million.[9]

The court of appeals appears to have carved out a new requirement of proof to support a punitive damage award. Neither the court of appeals, the parties, nor our research reveals any authority that proof of ill-gotten gains is necessary for an award of punitive damages. *See Moore v. American United Life Ins. Co.*, 150 Cal. App.3d 610, 197 Cal.Rptr. 878 (1984) ($2.5 million punitive award for insurance company's bad faith upheld without evidence of the profits from company's deceptive claims practices); *Chodos v. Ins. Co. of North America*, 126 Cal.App.3d 86, 178 Cal.Rptr. 831 (1981) ($200,000 punitive award upheld in light of insurer's wealth and nature of its acts, without proof of profits derived from insurer's appraisal practices). Indeed, Allstate admits that the "[a]ppellants were not required to present evidence of illicit profits to obtain an award of punitive damages." Appellee's Supplemental Brief at 34.

---

9. "Q. [Hawkins' counsel] My question was, this decision to take $35 off on every total loss for car cleanup is really quite an important decision from the company's standpoint; isn't that true?

A. [Schwenk] I would say so, yes.

Q. As a matter of fact, we could figure it out mathematically. If Allstate has 100,000 total loss claims every year, and they take $35 off on each one of those, that amounts to $3,500,000; doesn't it?

A. If you say so. I can't figure that far.

Q. If Allstate has one million total loss claims every year, if we figure it out mathematically, it would amount to a 35 million decision; isn't that right?

A. Yes."

Allstate argues that once Hawkins "intentionally released the specter of illicit profits" to solicit punitive damages, Hawkins must present more than speculative proof of such profits. Allstate suggests that the $3.5 million punitive damage award "bears more than a casual resemblance" to the amount Hawkins' counsel hypothetically suggested Allstate would gain from improperly deducting $35 from 100,000 total loss claims. *See ante* at n. 8. In effect, Allstate contends Hawkins did not meet its burden of producing evidence that establishes a reasonable basis from which the jury could estimate damages.

We agree that a damage award, punitive or otherwise, must be based on more than mere speculation or conjecture. However, we disagree that the punitive damage award in this case is the result of speculation or not justified by the evidence.

Arguably, if it were the only evidence from which to determine an appropriate award, a hypothetical suggestion of the profitability of a defendant's conduct would result in an award based merely on speculation. However, ample evidence was presented in this case from which the jury could assess an amount of punitive damages that would accomplish the dual goal of punishment and deterrence.

◼ We vest the trier-of-fact with discretion to award an amount of punitive damages that, in its judgment, will punish the defendant and serve as an example to deter future similar misconduct. Once exercised, this discretion should not be disturbed unless the award is the result of passion or prejudice. *Nielson v. Flashberg,* 101 Ariz. at 341, 419 P.2d at 520. The appropriate test of passion or prejudice is whether the verdict is "so manifestly unfair, unreasonable and outrageous as to shock the conscience of the court." *Acheson v. Shafter,* 107 Ariz. at 579, 490 P.2d at 835 (citing *Young Candy & Tobacco Co. v. Montoya,* 91 Ariz. 363, 370, 372 P.2d 703, 707 (1962)); *accord Linsenmeyer v. Hancock,* 23 Ariz. App. 444, 448, 533 P.2d 1181, 1185 (1985) (quoting *Wry v. Dial,* 18 Ariz. App. 503, 515, 503 P.2d 979, 991 (1972)

("The test to be applied ... is whether the 'verdict is so outrageously excessive as to suggest, at first blush, passion or prejudice.' ")). The amount of the award alone is not sufficient evidence to prove the jury acted with passion or prejudice. *Nienstedt v. Wetzel,* 133 Ariz. 348, 357, 651 P.2d 876, 885.

The previously outlined categories of evidence relevant to assess a sum of punitive damages, *see ante* at 497–498, 733 P.2d at 1080–1081, are equally applicable to determine whether sufficient evidence supports the $3.5 million award. A plaintiff is not required to put on proof of every factor, nor is any single factor a prerequisite to recovery of punitive damages. *See Nienstedt v. Wetzel,* 133 Ariz. at 357, 651 P.2d at 885 (evidence of defendant's wealth not required to recover punitive damages). Rather, the plaintiff must produce evidence so that the amount awarded may not be said to be "so unreasonable in regard to the circumstances as to show the influence of passion or prejudice." *Nielson v. Flashberg,* 101 Ariz. at 341, 419 P.2d at 520.

◼ We find that the amount of punitive damages awarded against Allstate is neither so excessive nor unreasonable in light of the circumstances as to show the influence of passion or prejudice. First, the $3.5 million punitive damage award is not disproportionate to Allstate's financial position. It is axiomatic that the wealthier the wrongdoing defendant, the greater the award of punitive damages necessary to punish him. *Maxwell v. Aetna Life Ins. Co.,* 143 Ariz. 205, 219, 693 P.2d 348, 362 (App.1984). We recognize, however, that the award must not financially kill the defendant. *Id.* Allstate's 1981 Annual Statement reported total assets of $8.6 billion, unassigned (surplus) funds of $2.4 billion, and net income of $346.7 million. The jury's award represents approximately 3½ days' net income or ⅟25 of 1% of total assets. This court, as well as others, has upheld punitive damage awards representing a greater percentage of the defendant's wealth against claims of excessiveness. *See Acheson v. Shafter,* 107 Ariz. 576, 490

P.2d 832 (1971) (award representing 5% of net worth upheld); *accord Dodge City Motors v. Rogers,* 16 Ariz.App. 24, 490 P.2d 853 (1971) (award representing 2 + weeks' net income and 4% net worth upheld);[10] *Moore v. American United Life Ins. Co.,* 150 Cal.App.3d 610, 197 Cal.Rptr. 878 (1984) (award representing 3.4 weeks of defendant's income and 3.2% of net assets upheld); *Wetherbee v. United Ins. Co.,* 18 Cal.App.3d 266, 271, 95 Cal.Rptr. 678, 681 (1971) (award equal to one week's after-tax earnings upheld). *Cf. Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 824, 169 Cal.Rptr. 691, 620 P.2d 141 (1979) (award reversed where it represented more than seven months of net income), *cert. denied and appeal dismissed,* 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980); *Merlo v. Standard Life and Acc. Ins. Co.,* 59 Cal. App.3d 5, 130 Cal.Rptr. 416 (1976) (punitive award constituting nearly one-third of defendant's net worth set aside).

Second, the amount of punitive damages is not outrageous or excessive in light of the particular nature of Allstate's conduct. In general, the more reprehensible the defendant's conduct and the more serious the harm likely to occur, the larger the appropriate punishment. *See ante* at 497–498, 733 P.2d at 1080–1081. The jury could have rationally concluded that Allstate's conduct was highly reprehensible and resulted in harm to countless insureds. The jury reasonably could have concluded that Allstate engaged in deceptive claims practices spanning up to 18 years whereby Allstate took advantage of its insureds' predicaments to settle claims at lesser amounts by deducting relatively small, innocuous amounts from each total loss claim under the guise of cost saving. The jury could have found this conduct particularly reprehensible because the average insured would be unlikely to discover or prosecute this misconduct, *see Moore v. American*

*Life Ins. Co.,* 150 Cal.App.3d at 637, 197 Cal.Rptr. at 895, and the deceptive practices were established company policy.

We hold that evidence of Allstate's wealth, the reprehensibility and duration of its conduct, and the potential effect on innumerable claimants is sufficient to support the $3.5 million punitive damage award.

## IV. CONSTITUTIONAL CHALLENGE

After oral argument and after our order granting the Hawkins' Petition for Review "on the issues set forth therein," filed May 2, 1986,[11] we granted Allstate's request to file supplemental briefs. Order (filed May 28, 1986). Allstate stated that the following reasons necessitated supplemental briefing:

A. It has been more than three years since the parties briefed the issues on appeal.

B. Significant developments in Arizona law relating to punitive damages have occurred since the filing of appellate briefs.

C. Since oral arguments were heard before the petition for review was granted, the entire record was presumably unavailable at the time of arguments and supplemental reference to the record is necessary and appropriate.

D. Questions by the court at oral argument suggest that clarification of certain critical evidentiary facts may be necessary.

Motion for Leave to File Supplemental Briefs and For Additional Oral Argument (filed May 16, 1986).

In its discussion of reason "B", Allstate pointed to three recent Arizona Court of Appeals cases relating to punitive damages and also requested "that this court allow additional briefing on the federal constitu-

---

**10.** The net worth and income amounts are not set forth in the reported decision but are contained in the record. *See* Maricopa Superior Court Case No. C–222384; Appellee's brief in CA–CIV 1457.

**11.** We heard oral argument before accepting review to determine whether this case raised issues not presented by two other cases previously accepted for review: *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565 (1986); *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 723 P.2d 675 (1986).

tional implications of the manner in which this punitive damage award was imposed under Arizona law." *Id.* at 5. Admittedly, Allstate hoped to "be afforded an opportunity to seek relief in the federal court system if punitive damages in any amount were ultimately assessed against appellee." *Id.* at 5–6. Allstate ultimately argued in its Supplemental Brief that punitive damages are a criminal penalty, which entitle a civil defendant to the same constitutional protections as a criminal defendant (e.g., proof beyond a reasonable doubt, protection against double jeopardy, privilege against self-incrimination, and conviction by a unanimous jury in Arizona) and, in the alternative, that procedural due process requires clear and convincing proof of entitlement to punitive damages.

Allstate acknowledges that the question of the constitutionality of punitive damage awards was not raised at trial, but argues that this issue properly may be raised for the first time on appeal because it involves issues "of a general public nature, affecting the interests of the state at large." Appellee's Supplemental Brief at 35 (citing *Town of South Tucson v. Board of Supervisors*, 52 Ariz. 575, 583, 84 P.2d 581, 584 (1938)). We agree that issues of "general statewide significance" are an exception to the general rule that an appellate court will not consider issues not raised in the trial court. *E.g., Barrio v. San Manuel Div. Hosp. for Magma Copper Co.*, 143 Ariz. 101, 692 P.2d 280 (1984). However, this general rule and its exception are rules of *procedure*, not matters of jurisdiction, established for the purpose of orderly administration and the attainment of justice. *Town of South Tucson v. Board of Supervisors*, 52 Ariz. at 582–83, 84 P.2d at 584. "Whether this court should review a question raised here for the first time depends upon the facts and circumstances disclosed by the particular record. It undoubtedly has the power, but ordinarily will not exercise it. The question is one of administration, not of power." *Id.* (quoting *Cappon v. O'Day*, 165 Wis. 486, 491, 162 N.W. 655, 657 (1917)). Thus, while we agree that this court has the power to consider the constitutional issues raised by

Allstate, we decline to exercise that power in this case.

Efficient and orderly administration requires some point in time at which it is too late to raise new issues on appeal. We note that Allstate did not raise its constitutional arguments in the pleadings, post-trial motions, court of appeals, petition (or cross-petition) for review, response to petition for review, or at oral argument. Allstate first voiced its constitutional concerns after the issues for review by this court were set by our order granting the petition for review. In light of this procedural history, we believe it does not promote sound appellate practice to consider issues so belatedly urged. Our order allowing supplemental briefing anticipated the parties would address the issues accepted for review and was premised on the parties' need to update its briefs filed three years earlier.

We hold that consideration of a constitutional issue raised for the first time on appeal is discretionary with this court. This is not a case involving denial of a fundamental constitutional right in a criminal trial nor contentions which affect the jurisdiction of the court, and we do not feel compelled to exercise our discretion.

Our decision to decline consideration of the constitutionality of the manner in which punitive damages were imposed is bolstered by our recent adoption of the clear and convincing standard of proof Allstate seeks. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 332, 723 P.2d 675, 681 (1986) (recovery of punitive damages "only upon clear and convincing evidence of defendant's evil mind"). Our decision to require a more stringent standard of proof for punitive damages than for compensatory damages was grounded on policy, not constitutional, considerations. *Id.* at 331–32, 723 P.2d at 680–81 (higher burden of proof necessary to preserve deterrent effect and prevent oppressiveness of loosely-assessed punitive damages).

## V. RETROACTIVITY OF CLEAR AND CONVINCING BURDEN OF PROOF

Here, the jury was instructed that it could award punitive damages in its discre-

tion if a preponderance of the evidence established conduct by Allstate that warranted such damages. Because we decline to consider whether the clear and convincing burden of proof is constitutionally required, the question we must address is whether the clear and convincing burden of proof for punitive damages announced in *Linthicum* applies retroactively to the dispute *sub judice.*

 In Arizona, a civil opinion is presumed to operate retroactively, as well as prospectively, unless otherwise stated. *Brannigan v. Raybuck,* 136 Ariz. 513, 520, 667 P.2d 213, 220 (1983) (citing *Chevron Chemical Co. v. Superior Court,* 131 Ariz. 431, 435, 641 P.2d 1275, 1279 (1982)). To overcome this presumption of retroactive application, Arizona utilizes the three factors set forth by the United States Supreme Court in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296, 305–06, (1971):

(1) Whether the decision establishes a new legal principle by either overruling clear and reliable precedent or deciding an issue whose resolution was not clearly foreshadowed;

(2) Whether retroactive application will further or retard operation of the rule, considering its prior history, purpose and effect; and

(3) Whether retroactive application will produce substantial inequitable results.

*See Brannigan v. Raybuck,* 136 Ariz. at 520, 667 P.2d at 220; *Chevron Chemical Co. v. Superior Court,* 131 Ariz. at 436, 641 P.2d at 1280; *Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309, 313, 560 P.2d 1216, 1220 (1977). These factors are sometimes referred to as the reliance, purpose, and inequity factors, respectively.

The reliance factor strongly favors prospective-only application. *Linthicum* announced a new principle of law that overruled clear and reliable precedent. Proof by a preponderance of the evidence is the traditional measure of proof for most civil cases. *See Schwalbach v. Jones,* 27 Ariz. 260, 232 P. 558 (1925); E. Cleary, *McCor-*

*mick on Evidence* § 339, at 956 (3d ed. 1984). Our research reveals no reported Arizona decisions foreshadowing this change; indeed, none even broaches the subject of a higher burden of proof for punitive damages.

Regarding the purpose factor, retroactive application of the new clear and convincing burden of proof standard would not "affect adversely the purpose behind the new rule." *See Chevron Chemical Co. v. Superior Court,* 131 Ariz. at 436, 641 P.2d at 1280 (restating *Chevron Oil Co. v. Huson*'s second factor). An important purpose of the more stringent burden of proof is to assure that punitive damages are properly awarded. The higher burden of proof underscores that punitive damages are an extraordinary remedy, to be assessed only in "the most egregious of cases." *Linthicum,* 150 Ariz. at 332, 723 P.2d at 681. The effect of the *Linthicum* rule is to allow the trier of fact to impose punitive damages only where he is convinced to a higher degree of probability that the defendant possessed the requisite evil mind. Applying this new rule retroactively obviously would not impair the purpose of the rule; however, neither would retroactive application significantly further its purpose. Current practice provides several avenues of review to assure that an award of punitive damages is justified: the plaintiff must get past a motion for a directed verdict, the jury must exercise its discretion to award punitive damages, the verdict is subject to post-trial motions and review by the trial judge, and the judgment is subject to appeal. All of these procedures are designed to assure that the award is justified and not the result of the jury's passion or prejudice.

The inequity factor also neither strongly favors nor disfavors prospective-only application of the change in law. This factor is closely related to the reliance factor and focuses on the injustice or hardship resulting from retroactive application of the new rule. *See Peagler v. Phoenix Newspapers,* 114 Ariz. at 313, 560 P.2d at 1220. Retroactive application of the new burden of

proof would force further litigation in this and other lawsuits similarly situated, where the parties have prepared and presented their cases in reliance upon clear precedent and with adequate protection against an improper award of punitive damages. Requiring plaintiffs to retry cases under a higher burden of proof where the passage of time will have impaired considerably their ability to discover evidence and prove their case certainly works an injustice. On the other hand, plaintiffs are not entitled to punitive damages as a matter of right; and, theoretically, they are fully compensated for their actual injury by the compensatory damage award. Arguably then, retroactive application creates only a minor hardship and goes one step further in assuring properly awarded punitive damages.

 Whether retroactive application is inappropriate if a single factor favors prospective application, or whether all factors must favor prospective application, is unclear. *See Brannigan v. Raybuck*, 136 Ariz. at 521, 667 P.2d at 221 ("[E]ven if three-part test of *Chevron Oil Co. v. Huson* is interpreted liberally, so that the proponent of prospective application is not required to satisfy all three elements, . . . ."); *Chevron Chemical Co. v. Superior Court*, 131 Ariz. at 436–37, 641 P.2d at 1280–81 (decision given retroactive application where all three factors were satisfied); *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 560 P.2d 1216 (looked only to lack of substantial inequitable results to conclude retroactive application proper). *See generally* Note, Confusion in Federal Courts: Application of the *Chevron* Test in Retroactive-Prospective · Decisions, 1985 U.Ill.L.Rev. 117. However, we need not establish a precise formula for applying these factors. Whether a judicial holding will be given only prospective application is a question of policy. *See Lemieux v. Superior Court*, 132 Ariz. 214, 644 P.2d 1300 (1982) (United States Constitution does not restrict retrospective-prospective decision of state courts).

 In this case, we are faced with a judicial decision announcing an unforeshadowed departure from clear and reliable precedent. We are concerned with the potential burden on the judicial system from further litigation where claims have been disposed of by prior litigation or settlement. *See Harmann v. Hadley*, 128 Wis.2d 371, 380, 382 N.W.2d 673, 677 (1986). Under these circumstances, we hold that the new burden of proof shall be given only prospective application. After September 15, 1986, the date *Linthicum* was mandated, punitive damages are recoverable only upon clear and convincing evidence of a defendant's evil mind.

The new burden of proof shall not apply where a verdict or judgment based upon proof by a preponderance of the evidence has been entered and where there is no reason to require a new trial other than application of the new burden of proof. *See Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 300, 294 N.W.2d 437, 458 (1980). *Cf. Tuttle v. Raymond*, 494 A.2d 1353 (Me. 1985) (higher standard of proof given retroactive application where prior case law gave notice of intent to reexamine burden of proof).

The decision of the court of appeals is vacated. The verdict for compensatory and punitive damages is affirmed and the matter is remanded for reinstatement of the original judgment dated August 3, 1982.

FELDMAN, V.C.J., and BRUCE MEYERSON J. Pro Tem., Court of Appeals, Division One, concur.

CAMERON, J., recused himself and did not participate in the determination of this matter, and BRUCE MEYERSON, J. Pro Tem., Court of Appeals, Division One, sat in his place and stead.

HAYS, J., participated in the determination of this matter but retired before this opinion was filed.

HOLOHAN, Justice, dissenting.

The concept of punitive damages has been the subject of considerable controver-

sy among legal scholars. Punitive damages are not allowed in some states; in others, restrictive rules have been developed to control such damages. The entire concept of punitive damages has been subjected to attack from some sources. RESTATEMENT (SECOND) OF TORTS § 908 comment f (1965). This court in *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986), and *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 723 P.2d 675 (1986), narrowed the field of conduct justifying punitive damages and adopted a higher standard of proof to justify the imposition of punitive damages. These reforms should not be viewed as the end of the reexamination of the concept of punitive damages.

The action by the court in this case in declining to apply the *Linthicum* standard of proof retroactively does not appear justified. The three factors of reliance, purpose and inequity, adopted in *Chevron Chemical Co. v. Superior Court*, 131 Ariz. 431, 641 P.2d 1275 (1982), for the retroactive-prospective analysis, weigh heavily for retroactive application of the *Linthicum* rule. Reliance on the old rule is the only factor which favors prospective application. The purpose of the new rule to avoid loosely assessed punitive damage favors retroactive application. Finally, the factor of inequity does not favor the plaintiffs because there is no particular right to punitive damages—they are a windfall. Punitive damages are a discretionary matter with the jury, and a retrial of the punitive damage issue does not deprive the plaintiffs of their right to compensatory damages—which are the only damages they had a right to recover.

From my review of the *Chevron* factors I conclude that they weigh in favor of the usual rule in civil cases of retroactive application. I therefore dissent from the decision of the court.

There is also another matter which deserves comment. The compensatory damage award in this case is $15,000, but the punitive damage award is $3.5 million which is three and one-half times the maximum fine which could have been imposed upon the defendant if it had been convicted of a felony. *See* A.R.S. § 13–803(A)(1) (Supp.1986). The amount of the award in this case is a clear illustration of the penal nature of such damages. The court, however, declines to consider the constitutional issues raised by the defendant concerning the current procedures for assessing punitive damages. I believe that this case presents the right opportunity for the court to consider the constitutionality of our procedures in determining and assessing punitive damages.

Two notable law review articles discuss a number of the constitutional issues arising from the current procedure employed by a number of states in determining and assessing punitive damages. Wheeler, *The Constitutional Case for Reforming Punitive Damages Procedures*, 69 VA.L.REV. 269 (1983); Grass, *The Penal Dimensions of Punitive Damages*, 12 HASTINGS CONST. L.Q. 241 (1985). Essentially, the authors agree that punitive damages are penal in nature and require a due process procedure greater than that required for civil matters but not as strict as that required for criminal matters. The authors note that juries are usually given no standards to guide them in assessing the amount of punitive damages. They are told that the purpose of punitive damages is to punish the defendant and to deter others. This is also the purpose of the criminal law. Unlike the criminal law, however, there are no defined limits to the punishment in the instance of punitive damages. The jury's discretion is virtually unlimited save and except for the occasional finding by an appellate court that the award was manifestly unfair, unreasonable or outrageous so as to shock the conscience of the appellate court. The authors conclude that such broad unguided discretion does not meet due process requirements for the assessment of what is in fact a criminal penalty.

At least three minimum requirements have been suggested as necessary for punitive damage procedures to meet due pro-

cess standards: (1) the procedure should be bifurcated from the compensation portion of the case; (2) proof of the right to punitive damages should be by clear and convincing evidence; and (3) the maximum amount for punitive damages should be established by law. Wheeler, *supra.*

The United States Supreme Court has not directly addressed the issue of procedural due process for assessing punitive damages. That court has noted that the due process clause protects civil litigants who seek recourse in the courts either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). On another occasion it has observed that in most jurisdictions jury discretion over the amounts awarded is limited only by the general rule that punitive damages not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused. Juries remain free to use their discretion selectively to punish or not punish. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Last year in *Aetna Life Insurance Co. v. Lavoie,* —— U.S. ——, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), the court acknowledged that challenges to the constitutionality of the lack of standards for the award of punitive damages raised important issues which, in an appropriate setting, must be resolved. The case was, however, decided on another basis which made it unnecessary for the court to resolve the challenge to the award of punitive damages.

No purpose can be accomplished by delaying a decision on the important issues raised by the defendant's challenge to the constitutionality of our present procedure for awarding punitive damages.

In *Linthicum* this court adopted the higher standard of proof to establish a claim for punitive damages. This action brings us part of the way towards meeting the suggested due process standards for assessing punitive damages. The mecha-

nism for meeting another requirement—bifurcated trial—is already in place. Arizona Rule of Civil Procedure 42(b), 16 A.R.S. permits separate trials of claims on any issue. A claim for punitive damages could and should be separated from the other issues in the case and tried separately after the plaintiff has prevailed on the issues for compensatory damages. The same jury which heard the first phase of the case could hear the second phase dealing with the punitive damages issue.

The only matter of real controversy is whether due process requires that limits be placed on the maximum amount which may be awarded for punitive damages. There appear to be strong arguments for the position that due process requires such maximum limits because of the penal nature of punitive damages. In any event, the issue should be considered and resolved.

The constitutional issues raised in this case will not disappear. Other counsel faced with the problem will, perhaps, make a better record, but ultimately this court must decide the issues. This case presented the opportunity for this court to resolve the challenges to the constitutionality of the Arizona procedure for awarding punitive damages. The decision of the court leaves the matter in doubt and speculation.