IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| ERIKA CRACKEL, now known as ERIKA GUENTHER, and TAMMIE GUENTHER, now known as TAMMIE DRANNAN, | ) ) ) ) | |
| Plaintiffs/Appellants/ Cross-Appellees, | ) ) ) | 2 CA-CV 2002-0123 DEPARTMENT B |
| v. | ) ) | O P I N I O N |
| ALLSTATE INSURANCE COMPANY, a foreign corporation, | ) ) ) ) | |
| Defendant/Appellee/ Cross-Appellant, | ) ) ) | |
| and | ) ) | |
| BLAINE S. GAUB, | ) ) | |
| Defendant/Appellee. | ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C329946

Honorable John M. Quigley, Judge
Honorable Gilbert Veliz, Judge

AFFIRMED

Thur & O'Sullivan, P.C.
  By Calvin C. Thur and Roger O'Sullivan

Scottsdale
Attorneys for Plaintiffs/
Appellants/Cross-Appellees

Steptoe & Johnson LLP
 By Floyd P. Bienstock, Karl M. Tilleman,
    Bennett Evan Cooper, and Jason Sanders

Phoenix
Attorneys for Defendant/
Appellee/Cross-Appellant

Chandler, Tullar, Udall & Redhair
 By D. B. Udall

Tucson
Attorneys for Defendant/Appellee

E C K E R S T R O M, Judge.

¶1 We previously issued an opinion in this matter. On the parties' motions for reconsideration, however, we vacated our prior opinion and now, in light of certain points raised in those motions, issue this new opinion in its stead.

¶2 Appellants Erika Guenther and Tammie Drannan sued Allstate Insurance Company and attorney Blaine Gaub for abuse of process. A jury found Allstate liable and awarded Guenther and Drannan compensatory but not punitive damages. The jury found in favor of Gaub. On appeal, Guenther and Drannan argue that the trial court abused its discretion in excluding evidence of Allstate's behavior in several other claims, in excluding portions of a judicial order sanctioning Allstate in the underlying personal injury action Guenther and Drannan had filed against an Allstate insured, and in denying their request to produce several Allstate claims files. They also argue that the trial court improperly instructed the jury on the elements of an abuse-of-process claim. Allstate cross-appeals, asserting that the trial court erred in denying its motion for judgment as a matter of law (JMOL) and that the jury's verdict in favor of Gaub necessarily exonerated Allstate as well. We affirm.

## Background

¶3       We view the facts and the reasonable inferences therefrom in the light most favorable to upholding the jury's verdicts. S Dev. Co. v. Pima Capital Mgmt. Co., 201 Ariz. 10, ¶16, 31 P.3d 123, ¶16 (App. 2001). On November 28, 1995, Drannan and her infant son were passengers in Guenther's car. Harvey Hamilton drove a car into the back of Guenther's car while Guenther was stopped at a traffic light in Casa Grande. Although Guenther's car suffered little or no damage from the collision, she experienced some pain in her neck and shoulder area from the impact. Drannan, who was six months pregnant, felt a cramping-type pain in her abdominal area and was urged to go to the emergency room to be evaluated. Both women were examined in a hospital emergency room and released. Guenther was diagnosed with a whiplash injury to her neck and spine. The emergency room physician instructed Drannan to see her obstetrician as soon as possible. Neither Guenther nor Drannan sought, or incurred any costs for, treatment beyond the initial evaluations the emergency room physician had recommended. Guenther and Drannan filed a lawsuit against Hamilton in Pinal County Superior Court in February 1997, seeking special damages of approximately $720 in medical expenses Guenther had incurred and the $890 in medical expenses Drannan had incurred in addition to unspecified general damages.

¶4       Allstate, Hamilton's automobile liability insurer, adopted a company policy in August 1995 concerning minor-impact, soft-tissue (MIST) claims. Under the policy, automobile accident claims involving property damage of less than $1,000 in which the claimant was represented by an attorney were to be handled by one claims adjuster. Allstate characterized Guenther's and Drannan's claims as MIST claims and assigned them to adjuster Shirlee Kopin for processing. Kopin had copies of the medical bills Guenther and Drannan had incurred and knew

3

that Allstate had already "admitted 100 percent negligence" by Hamilton. Kopin nonetheless instructed Gaub, the attorney Allstate retained to represent Hamilton in the personal injury litigation, to serve on the plaintiffs a joint offer to confess judgment for a total of $101.[1] Kopin believed the offer was fair because, "based on [her] experience and knowledge of the file, [she] thought a defense verdict was a real possibility in this case." Her belief was based in large part on Allstate's position that any injury reportedly caused by "a minor impact" was "suspect."

¶5        Altogether, Allstate expended over $4,500 defending Guenther's and Drannan's claims up to and including preparation for arbitration. Allstate took Guenther's and Drannan's depositions in July 1997 and learned that Guenther, Drannan, and Drannan's son had been in another automobile accident about one month before the accident with Hamilton. During their depositions, both Guenther and Drannan said they were still experiencing occasional discomfort from the Hamilton accident. Allstate hired a biomechanical expert to determine whether Guenther's and Drannan's reported discomfort could have been caused by the accident with Hamilton. Although Kopin did not suspect that Guenther and Drannan had been "overtreat[ed]" for their injuries, and neither Guenther nor Drannan had been treated for their injuries in more than nineteen months, Allstate nevertheless required Guenther and Drannan to submit to independent medical examinations (IME) with Dr. John LaWall.

¶6        By October, Kopin believed she had collected enough information to "actually evaluate[]" Guenther's and Drannan's claims. She assessed Allstate's liability and recommended

---

[1]We question whether this unapportioned joint offer would have been effective to impose sanctions under Rule 68(d), Ariz. R. Civ. P., 16 A.R.S., Pt. 2. See Duke v. Cochise County, 189 Ariz. 35, 40-41, 938 P.2d 84, 89-90 (App. 1996).

that Gaub offer Guenther $801 and Drannan $1,001 to settle the claims. Guenther and Drannan rejected the offer. Guenther did so because, by this stage in the case, the amount offered would not have "fairly compensated" her lawyer for his work.

¶7 The case proceeded to mandatory arbitration in October. When the arbitrator asked Gaub what the case was worth, he responded that it was worth "zero" and that Guenther and Drannan deserved "nothing." The arbitrator awarded Guenther $2,300 and Drannan $3,400. At trial in this case, Kopin admitted she had believed the awards were "not . . . bad," but she had directed Gaub to appeal them because, in part, she believed arbitration awards generally are higher than the actual value of claims. Gaub testified at trial that the decision to appeal the arbitration award could only have been made by Allstate but stated, "Seldom has a plaintiff recovered [from a jury an award] anywhere near the arbitration award." Guenther was "frustrated" and Drannan was apparently "distraught" when Allstate appealed the award.

¶8 After Allstate appealed the award, the parties were ordered to attend a settlement conference before Judge O'Neil. Based on their conduct, Judge O'Neil found that Hamilton and Gaub had not participated in the settlement conference in good faith. The court struck Hamilton's answer and ordered the case to be tried solely on the issue of damages. The parties then settled Guenther's and Drannan's claims for the amounts originally awarded them in arbitration.

¶9 Guenther and Drannan later filed this action, claiming Allstate had abused legal process in defending the underlying personal injury action. The jury awarded Guenther and Drannan $7,500 each in compensatory damages. The trial court denied their subsequent motion for new trial, and this appeal and cross-appeal followed.

5

Cross-Appeal

¶10       Allstate cross-appeals from the trial court's denial of its motion for JMOL on Guenther's and Drannan's abuse-of-process claim. Because this issue could be dispositive, we address it first, starting with the law of abuse of process and then applying that law to Allstate's JMOL motion.

¶11       The elements of an abuse-of-process claim are "(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." Nienstedt v. Wetzel, 133 Ariz. 348, 353, 651 P.2d 876, 881 (App. 1982). A party can demonstrate the latter element by "showing that the process has been used primarily to accomplish a purpose for which the process was not designed." Id. In the context of this tort, Arizona interprets "process" as encompassing "the entire range of procedures incident to the litigation process." Id. at 352, 651 P.2d at 880.

¶12       Citing this language in Nienstedt, Guenther and Drannan argue that an abuse-of-process claim may be based on the worthiness of the litigation "process as a whole." They maintain that Allstate pursued a stated policy of refusing to compromise claims and engaging in unnecessarily vigorous and expensive litigation in MIST cases, making it financially unfeasible to pursue a claim for modest damages against an Allstate insured. They assert that the court procedures for civil litigation were designed to facilitate a fair resolution of individual disputes and were not intended to provide well-funded litigants like Allstate the means to deter claimants from litigating their claims by making litigation too costly. Drannan and Guenther maintain that Allstate's stated policies, coupled with evidence of Allstate's behavior in the underlying personal injury action, constituted adequate evidence to support an abuse-of-process claim.

6

¶13　　Although Allstate concedes that abuse-of-process claims need not be anchored in the strictest definition of court "process," it insists that a plaintiff must nevertheless establish that a litigant initiated a specific compulsory act or proceeding under court authority with improper motives. It argues that a civil defendant's mere decision not to settle, and to thereby require the plaintiff to prove his or her case, even if carried out with improper motives, does not constitute abuse of process. Allstate maintains that such decisions do not involve the initiation of a specific compulsory procedure. Allstate asserts that anchoring the tort on the defendant's motives as to the "litigation process as a whole" would spawn a flood of collateral litigation to second-guess the motives of litigants who decline to settle or who vigorously defend or pursue their claims.

¶14　　We agree with Allstate that a plaintiff must prove that one or more specific judicially sanctioned processes have been abused to establish an abuse-of-process claim. Although Nienstedt allows such claims to be predicated on the abuse of "the entire range of procedures incident to the litigation process," id., Guenther and Drannan have taken that language out of context to suggest that Nienstedt invites abuse-of-process claims that fail to describe the abuse of any particular court process. In Nienstedt, the defendants had argued that such claims should be narrowly limited to improper use of court-sanctioned service of process. Responding to that argument, the court stated:

> We reject appellants' suggestion that we adopt the position taken by some courts which require as an additional element of an abuse of process claim . . . a showing that the wrongful use of the court's process has resulted in the seizure of plaintiffs' person or property. Such a requirement has not been set forth in prior Arizona decisions . . . and . . . would limit the scope of the tort to those instances involving the use of "process" in the strictest sense of that term. As previously indicated, the later authorities interpret "process" as encompassing the entire range of court procedures incident to the litigation process, and do not restrict the tort to the

7

> utilization of process in the nature of attachment, garnishment or warrants of arrest.

Id. at 353, 651 P.2d at 881 (citations omitted; emphasis added). The court did not address whether a claim could be predicated on the litigation process as a whole or on a defendant's mere refusal to settle. Rather, the court specified which court processes arguably had been misused by the defendant in the underlying action. That analysis would have been unnecessary if a claimant were only required to establish that the defendant had possessed an improper purpose in sustaining the overall litigation. Id. at 351-54.

¶15 Subsequently, this court confirmed that a claimant must present evidence that the defendant committed a specific "wilful act . . . not proper in the regular conduct of the proceedings" to support a claim for abuse of process and that evidence of the defendant's mere persistence in litigation, even if based on an improper motive, does not sustain the tort. Morn v. City of Phoenix, 152 Ariz. 164, 166, 168, 730 P.2d 873, 875, 877 (App. 1986); see also Simon v. Navon, 71 F.3d 9, 17 (1st Cir. 1995) ("[P]roof of a specific act in an abuse of process setting provides concrete assurance that a process actually has been abused."). Accordingly, we reject Guenther and Drannan's contention that a generalized allegation that a defendant has misused the litigation process as a whole can support a claim of abuse of process. Rather, it must be based on something more than the opposing party's mere persistence in the litigation.

¶16 On the other hand, we reject Allstate's suggestion that an abuse-of-process claim may be based only on a limited range of court procedures, those by which a litigant uses court procedural authority to compel opposing litigants "to act or forbear to act" in some way. Although Nienstedt does not invite abuse-of-process claims based on an amorphous allegation that a party

8

misused the litigation process as a whole, it allows such claims when a litigant has abused any of the "entire range of court procedures incident to the litigation." 133 Ariz. at 353, 651 P.2d at 881 (emphasis added). In using such inclusive language, the court appeared to reject any limitation on the types of court processes that, if abused, can support a claim.[2] Id. As noted, the court specifically identified several court processes that, if abused, could support an abuse-of-process claim on the specific facts before it. Among them were several court processes that a litigant can abuse without forcing an opposing litigant to act or forbear to act. Id. at 351-53, 651 P.2d at 779-81 (identifying motions for change of judge and for continuances as procedures, the abuse of which can support a claim); see also General Refractories v. Fireman's Fund Ins., 337 F.3d 297, 302, 304, 310-11 (3d Cir. 2003) (applying Pennsylvania law and suggesting that abuse-of-process claim could be based on defendants' behavior in responding to discovery requests or misrepresentations made to opposing counsel and the court). Thus, no Arizona court has expressly refused to limit the grounds upon which the tort may be based in the manner Allstate suggests.

¶17    We also conclude that a litigant may commit abuse of process while merely defending an underlying action. As noted, an abuse-of-process claim may be based on the full range of court procedures provided by the civil litigation process. Nienstedt. Those procedures are designed for the benefit of defendants as well as plaintiffs and can therefore be equally abused by defendants. In Nienstedt, for example, the court upheld the verdict against the Wetzel defendants even though they had acted as both plaintiffs and counterdefendants in the underlying action. 133 Ariz. at 351, 651 P.2d at 879 (observing that the Nienstedts had filed a counterclaim

---

[2]In Nienstedt, Arizona adopted a liberal view on the types of court processes that can support a claim. See 2 Dan B. Dobbs, The Law of Torts § 438 at 1235-36 (2001).

in prior litigation). In General Refractories, the court acknowledged that a defendant's abuse of the discovery process could constitute abuse of process and granted the plaintiff leave to amend the complaint to articulate its allegations more specifically. 337 F.3d at 308-11; see also Torok v. Yost, 335 S.E.2d 419, 421 (Ga. Ct. App. 1985) (plaintiff could base abuse-of-process claim on defendant's filing frivolous counterclaim for improper purpose).

¶18        Allstate argues that, if we do not limit the abuse-of-process tort as it suggests, the tort will become "an amorphous cloud that hangs over everything a litigant does." However, our courts have imposed two additional requirements that deter frivolous, unfounded, or ill-defined claims. First, a claimant must present more than mere speculation to support the assertion that the defendant has used court processes with an improper intent. Instead, a plaintiff must show that the defendant's improper purpose was the primary motivation for its actions, not merely an incidental motivation. Nienstedt, 133 Ariz. at 354, 651 P.2d at 882; see also Morn, 152 Ariz. at 166-67, 730 P.2d at 875-76. The Restatement of Torts addresses the significance of the "primary purpose" requirement:

> The significance of th[e] word ["primarily"] is that there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. Thus, the entirely justified prosecution of another on a criminal charge . . . does not become abuse of process merely because the instigator dislikes the accused and enjoys doing him harm; nor does the instigation of justified bankruptcy proceedings become abuse of process merely because the instigator hopes to derive benefit from the closing down of the business of a competitor.

Restatement (Second) of Torts § 682 cmt. b (1977). Thus, a claim of abuse of process may not be based solely on the fact that an opposing litigant received some secondary gain or emotional

10

satisfaction from the use of a court process. Rather, to survive a motion for JMOL, a claimant must have presented evidence that the court process was used primarily to pursue that improper motive.

¶19        Second, to demonstrate a defendant's primary motive was improper, a claimant must establish that the defendant used a court process in a fashion inconsistent with legitimate litigation goals. In Nienstedt, the court explained this requirement as follows:

> We recognize that the utilization of virtually any available litigation procedure by an attorney will generally be accompanied by an awareness . . . that his action will necessarily subject the opposing party to additional legal expenses. The range of feeling in the initiating attorney evoked by that awareness might well vary from instances of actual indifference to instances of intense satisfaction. . . . Liability should result only when the sense of awareness progresses to a sense of purpose, and, in addition the utilization of the procedure for the purposes for which it was designed becomes so lacking in justification as to lose its legitimate function as a reasonably justifiable litigation procedure.

133 Ariz. at 354, 651 P.2d at 882 (emphasis added); see also General Refractories, 337 F.3d at 308. Thus, plaintiffs must not only present evidence that the defendant used a court process for a primarily improper purpose, they must also show that, in using the court process, the defendant took an action that could not logically be explained without reference to the defendant's improper motives.

¶20        We now turn to the question whether, in light of these principles, the trial court erred by denying Allstate's JMOL motion. A motion for JMOL should be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party on that issue." Ariz. R. Civ. P. 50(a)(1), 16 A.R.S., Pt. 1. In reviewing a ruling on a motion for JMOL, we view the facts in the light most favorable to the party opposing it. Saucedo ex rel. Sinaloa v.

11

Salvation Army, 200 Ariz. 179, ¶9, 24 P.3d 1274, ¶9 (App. 2001). In considering a JMOL motion, a trial court should apply the same test for deciding whether to grant a motion for summary judgment, that is, the "motion should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." Orme Sch. v. Reeves, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). We review de novo a trial court's denial of a motion for JMOL. Monaco v. HealthPartners of S. Ariz., 196 Ariz. 299, ¶6, 995 P.2d 735, ¶6 (App. 1999).

I.  Evidence that Allstate acted with an improper purpose

¶21        Allstate argues that Guenther and Drannan presented so little evidence that Allstate had acted with an improper purpose in defending the personal injury claims that no rational jury could have agreed with Guenther and Drannan's position. In the context of an abuse-of-process claim,

> "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance of any formal use of the process itself, which constitutes the tort."

Morn, 152 Ariz. at 168, 730 P.2d at 877, quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 121, at 898 (5th ed. 1984). Guenther and Drannan maintain that Allstate used the prospect of sustained and expensive litigation as a "club" in an attempt to coerce them, and other similarly situated claimants, to surrender those causes of action that sought only modest damages.

12

¶22 We have little trouble concluding that such a use of court processes would be improper. See Nienstedt, 133 Ariz. at 354, 651 P.2d at 882 (use of process to expose injured party to excessive attorney fees and legal expenses constitutes improper purpose). But Guenther and Drannan were required to establish that Allstate's alleged improper purpose was its primary motivation for using the process as it did and that the improper purpose was not merely an incidental and collateral motivation. See Morn, 152 Ariz. at 166-67, 730 P.2d at 875-76; Nienstedt, 133 Ariz. at 354, 651 P.2d at 882.

¶23 Guenther and Drannan presented evidence that Allstate had adopted written policies governing MIST claims directing its adjusters and attorneys to handle certain kinds of claims in such a way that it would not be financially feasible for claimants to pursue litigation. Allstate instructed its representatives to "do-whatever-it-takes [sic] to remove any need" for claimants to retain an attorney to assist in settling claims, including making "settlement offers in a range that will make [a] claim economically unacceptable to an attorney." In another manual, Allstate management told personnel to take a "proactive stance on MIST cases" and "force[] the attorney and the claimant to think about the obstacles they must overcome to reach a realistic settlement or a walk-away settlement." According to the policy, an increase in Allstate's trial activity would constitute one such "obstacle." The MIST policy further stated that one of its goals was "to send a message to attorneys of our proactive stance on MIST cases."

¶24 In denying Allstate's motion for summary judgment on the improper purpose element, the trial court placed some weight on the obvious implication of that policy, stating:

> [Guenther and Drannan] allege that [Allstate's] actions are part of a
> policy regime designed to harass, intimidate and inflict excessive
> expense on plaintiffs. [Allstate's] own manual regarding Claim Core

13

Processing Redesign (CCPR) and Minor Injury Soft Tissue (MIST) claims seems to support this argument.

Although Allstate was entitled to present information to the jury explaining why those policies might have been misunderstood or taken out of context, these policies at a minimum created a factual question whether Allstate had intended to use court processes to achieve corporate goals inconsistent with the proper purpose of those court processes.

¶25 In assessing whether a reasonable jury could determine that Allstate's allegedly improper corporate goals constituted a primary motivation for the use of court processes in this case, the trial court was also entitled to consider evidence of Allstate's conduct in the underlying litigation. See Morn, 152 Ariz. at 168, 730 P.2d at 877 (ulterior motive may be inferred from defendants' acts in underlying case). Allstate initially served on Guenther and Drannan an offer of judgment for $101. It did so even though it conceded its insured had been one hundred percent negligent in the accident; it knew Guenther and Drannan initially were not seeking special damages beyond the costs of their precautionary emergency room visits and the isolated follow-up visits recommended by the emergency room physician; and it possessed the medical records corroborating the costs of the precautionary medical examinations.

¶26 At the time Guenther and Drannan filed their damages action against Hamilton, they had incurred medical expenses of merely $1,600. Nonetheless, Allstate pursued a litigation strategy that cost it in excess of $4,500 to defend facially valid claims and prepare for arbitration. Although neither Guenther nor Drannan had obtained any continuing treatment in the nineteen months after the accident and were therefore not seeking special damages beyond their initial medical expenses, Allstate demanded that Guenther and Drannan submit to IMEs pursuant to

Rule 35, Ariz. R. Civ. P., 16 A.R.S., Pt. 1. It also retained a biomechanical expert to evaluate Guenther's and Drannan's injuries and act as a potential expert witness.

¶27 After the IMEs, Allstate's medical examiner stated that he could not fault Guenther or Drannan for seeking precautionary care after the collision. Nonetheless, Gaub took the position during arbitration that the case was worth "zero" and that Guenther and Drannan deserved "nothing." Allstate then appealed an arbitration award that their own adjuster conceded was "not . . . bad."

¶28 Thereafter, a Pinal County trial judge found that Allstate's counsel had failed to participate in good faith in a mandatory settlement conference. That court sanctioned Allstate for its behavior during that settlement conference on the grounds that Allstate had: (1) intentionally refused to abide by the local rule requiring distribution of pretrial memoranda to opposing counsel in preparation for the conference, (2) told the trial court that nothing the court could say would affect Allstate's negotiating position, and (3) misrepresented the conclusions of Allstate's expert on whether it had been reasonable for Drannan to seek medical attention after the accident. Based on Gaub's comments during the settlement conference and his previous efforts to cancel that proceeding altogether, the jury could have reasonably concluded Gaub had engaged in the sanctioned behavior precisely to convey his resolve to litigate the case in conformity with Allstate's MIST policy.[3]

---

[3]Gaub stated during the conference that Allstate "draw[s] a line in the sand in these cases," directly referring to Allstate's MIST policy. Gaub had previously contacted Guenther and Drannan's counsel and unsuccessfully attempted to secure an agreement to cancel the settlement conference on the ground that little could be accomplished by that exercise. Kopin had noted in her negotiations plan that she had told Guenther and Drannan's counsel prior to the settlement conference that she was not going to increase Allstate's settlement offers at the conference. She

¶29        Allstate has presented alternate explanations for its conduct, suggesting its actions were not improperly motivated.[4]  It is not our province to make any findings of fact on this question.  Because we must view the direct and circumstantial evidence of improper motive in the light most favorable to Guenther and Drannan, see Saucedo, and because the evidence must be considered in the context of Allstate's other behavior in the underlying case,[5] we cannot say that the trial court erred in concluding that Gunether and Drannan had presented sufficient evidence to survive a motion for JMOL on this element of the tort.  See 2 Dan B. Dobbs, The Law of Torts § 438, at 1236-37 (2001) (improper purpose "may be inferred from what is said or done"); Keeton, supra, § 121, at 899 ("The ulterior motive may be shown by showing a direct demand for collateral advantage; or it may be inferred from what is said or done about the process.").  In short, a jury reasonably could have concluded that Allstate's actions had been consistent with a primary motive to use the processes of our civil litigation system to pursue a corporate policy of deterring future claims rather than with any genuine intention to use those processes to resolve the underlying dispute.

II.  The reasonableness of Allstate's actions in using specific court processes

¶30        We now turn to the question whether a reasonable jury could have found that Allstate's "utilization of the procedure for the purposes for which it was designed becomes so

---

had also told him that she did not think there was any point in going to the settlement conference absent additional information.

[4]For example, Allstate explained its decision to conduct IMEs by noting that both Guenther and Drannan had claimed in their depositions that they still suffered occasional pain from their minor injuries arising from the collision.

[5]We do not decide whether any of the above behaviors during litigation, standing alone, would constitute adequate evidence of any improper primary purpose.

lacking in justification as to lose its legitimate function as a reasonably justifiable litigation procedure." Nienstedt, 133 Ariz. at 354, 651 P.2d at 882. And, we must also consider whether Guenther and Drannan established that Allstate used a specific court process in a manner that was inconsistent with legitimate litigation goals. Id. at 353, 651 P.2d at 881.

¶31        During oral argument before this court, Guenther and Drannan asserted that Allstate had abused several specific court processes by: (1) asserting a contributory negligence defense although it had concluded that its own insured was entirely at fault; (2) serving an offer of judgment for $101 to be split between the two plaintiffs when it knew that the undisputed medical costs Guenther and Drannan had incurred exceeded $1,000; (3) exercising its procedural right to conduct IMEs even though neither plaintiff was seeking to recover medical expenses for treatment arising from ongoing injuries; (4) appealing the arbitration award even though its adjuster had characterized that award as reasonable; and (5) engaging in misconduct at the mandatory settlement conference.

¶32        Allstate insists either that it pursued each of those actions with justifiable litigation goals or that we simply cannot consider them because they occurred during settlement proceedings or negotiations, and "settlement conduct does not involve use of the judicial process." We need not decide whether each of the above processes as used here could be justified as reasonable actions in the course of litigation because a jury could reasonably have found that Gaub's conduct on Allstate's behalf during the mandatory settlement conference, standing alone, constituted an abuse of a specific court process and that his behavior could not be justified as a reasonable litigation strategy.

¶33     The Pinal County Superior Court ordered the parties to attend the "mandatory pre-trial settlement conference," as authorized by Rule 16, Ariz. R. Civ. P, 16 A.R.S., Pt. 1. Portions of that rule, which authorizes courts to "expedite the disposition" of civil cases and conduct pretrial settlement conferences, were specifically drafted "to reduce discovery abuse and to make the judicial system in Arizona more efficient, expeditious, and accessible to the people." Ariz. R. Civ. P. 16(b), cmt. to 1991 amendment. Thus, the mandatory settlement conference the court ordered arose from a procedural rule designed specifically to focus litigants on the legitimate public policy goals of the civil justice system.

¶34     Allstate conducted itself at that settlement conference in a manner contrary to serving the public policy purposes of the court procedure and did so to the detriment of Guenther and Drannan. The court directed the parties to exchange memoranda on their respective settlement positions. The court also ordered that those individuals with settlement authority attend the conference along with the parties' attorneys. Guenther and Drannan abided by the court's order by giving Allstate their settlement memorandum, by attending the conference, and by participating in good faith—actions that correspondingly required Guenther and Drannan to seek further services from their retained counsel.

¶35     In contrast, Gaub filed on Allstate's behalf an incomplete memorandum entitled "Confidential Position Statement" and failed to provide the memorandum to Guenther and Drannan.[6] Although Gaub attended the settlement conference, he did not bring the missing portions of Allstate's memorandum. In essence, he refused to participate in the court's efforts to encourage

_____

[6]Although the memorandum discussed the reports of its expert witnesses and referred to them as "attachments," Allstate failed to attach any such reports to the memorandum.

18

a nontrial resolution by stating that Allstate had "decided to draw a line in the sand on all cases like this" and by informing the court that no observation by the court could have any possible effect on Allstate's settlement position. As discussed in ¶ 28, supra, Gaub then misrepresented the conclusions of Allstate's expert on whether it had been reasonable for Drannan to seek medical attention after the accident.

¶36 Gaub maintained at trial that his failure to abide by the procedural requirements of the settlement conference and his misrepresentation regarding Dr. LaWall's opinion were honest, unintentional, oversights. He further testified that his remarks expressing a lack of willingness to consider the trial court's input had been taken out of context. But the jury was not required to accept Gaub's version of the events. It could also have reasonably concluded that the series of "mistakes" and defiant remarks were part of a comprehensive effort to discourage current and future claimants in conformity with Allstate's MIST policy. And, whether Gaub's pivotal misrepresentation about Drannan's core claim for damages reflected an intentional effort to mislead the court or merely a lack of preparation for, and interest in, the settlement conference, the jury could have concluded that it demonstrated Allstate's overt defiance of the purposes of the procedure.

¶37 Allstate observes, correctly, that a mere failure to settle or refusal to make a settlement offer cannot constitute abuse of process and emphasizes its absolute right to refuse to settle a claim. See Halaby, McCrea & Cross v. Hoffman, 831 P.2d 902, 908 (Colo. 1992) (attendance at settlement conference with settlement authority capped at $300 not ground for sanctions); Kamaunu v. Kaaea, 56 P.3d 734, 743-45 (Haw. Ct. App.), aff'd, 57 P.3d 428 (Haw. 2002) (mere refusal to settle during settlement conference not proper ground for court-imposed

sanctions). Allstate warns of the mischief to the orderly resolution of disputes that could occur if settlement positions could be the basis for collateral litigation. But we do not suggest that Allstate abused process by declining to settle on Guenther's and Drannan's terms during the mandatory settlement conference. Rather, the jury could have found that Allstate had abused that process by violating the court's orders, by misrepresenting a fact, by failing to participate in good faith during that procedure, and by doing so to the detriment of Guenther and Drannan, whom Allstate knew were equally duty-bound to comply with the court's instructions. The settlement judge emphasized this very distinction when it sanctioned Allstate for that behavior:

> The decision by [Allstate] to offer a sum to settle this case was not a factor for the Court in making its decision to issue a sanction any more than if [Allstate], in good faith, had decided not to make any offer to settle the case. The issue for this Court is the decision by [Allstate] not to participate to any extent in good faith negotiations.

¶38 Allstate also argues that "a court-ordered settlement conference" cannot give rise to the tort of abuse of process when, as here, the defendant did not cause the settlement conference to be held. But we have already rejected Allstate's premise that the tort is limited to abuse of only those court processes by which a litigant can compel opposing parties "to act or forbear to act" in some way. Allstate cites Ruberton v. Gabage, 654 A.2d 1002, 1005 (N.J. Super. Ct. App. Div. 1995), for the proposition that misbehavior at a mandatory settlement conference can never provide the basis for an abuse-of-process claim. But, there, a New Jersey court rejected the plaintiff's claim specifically because New Jersey law, unlike Arizona legal precedent, authorizes the tort only when a defendant has abused a process "used by a court to 'acquire or exercise its jurisdiction over a person or over specific property.'" Id., quoting Black's Law Dictionary 1084 (5th ed. 1979); compare Ruberton with Nienstedt, 133 Ariz. at 353, 651 P.2d at 881 (explicitly rejecting limitation

20

of tort to circumstances involving "seizure of plaintiff's person or property" and interpreting process "as encompassing the entire range of court procedures").

¶39            Generally, so long as the party challenging the reasonableness of an action raises a question of fact, reasonableness remains a question for the trier of fact. See Siddons v. Bus. Prop. Dev. Co., 191 Ariz. 158, ¶7, 953 P.2d 902, ¶7 (1998); Clearwater v. State Farm Mut. Auto. Ins. Co., 164 Ariz. 256, 260, 792 P.2d 719, 723 (1990); Trustmark Ins. Co. v. Bank One, Ariz., NA, 202 Ariz. 535, ¶25, 48 P.3d 485, ¶25 (App. 2002). The trial court properly denied Allstate's motion for JMOL on this issue because Guenther and Drannan raised a question of fact whether Allstate had abused a specific court process in a fashion not consistent with reasonably justifiable litigation goals.

III.  Other abuse-of-process issues

¶40            Allstate further contends Guenther and Drannan failed to show they had actually been injured as a result of Allstate's abuse of process in their personal injury action.[7] Allstate specifically argues that Guenther and Drannan suffered no monetary damage from its behavior at the settlement conference because the costs of preparing for that conference, and the inconvenience of attending that conference, arose from the court order setting the conference and would therefore have been incurred by Guenther and Drannan "even if Gaub had fulfilled his obligations flawlessly." Allstate is correct that Guenther and Drannan must demonstrate that they suffered

---

[7]Guenther and Drannan originally maintained that Allstate had waived this argument by not raising it below. But Allstate specifically argued in its motion for JMOL that Guenther and Drannan had suffered no actual injury arising from its behavior at the settlement conference.

harm arising from Allstate's abuse of the process to establish a claim, Nienstedt, 133 Ariz. at 353, 651 P.2d at 881, but they are incorrect that Guenther and Drannan made no such showing here.

¶41 First, the jury could infer that Guenther and Drannan rejected offers by Allstate to cancel the settlement conference because Guenther and Drannan placed some value in that process.[8] In deciding to incur the costs and inconvenience of the settlement conference, Guenther and Drannan were entitled to assume that Allstate would participate in that process in good faith. See Ariz. R. Civ. P. 16(f) and 16.1, 16 A.R.S., Pt. 1 (failure to participate in good faith at pretrial settlement conference renders party or attorney subject to sanctions). Thus, the jury could conclude that Allstate harmed Guenther and Drannan by depriving them of the benefit to be derived from the cost and inconvenience of preparing for and attending the conference: Allstate's good faith participation in a process wherein both parties would receive and consider judicial input on the wisdom of their settlement positions.[9]

¶42 Moreover, the trial court instructed the jury that it could assess damages to Guenther and Drannan based on "[e]motional distress, humiliation, inconvenience or anxiety" caused by Allstate's abuse of process. Drannan testified that she felt "very frustrat[ed]" after the events of the settlement conference. Guenther testified that she felt upset at the settlement conference when Gaub made the statement "that he draws a line in the sand on cases like this." Shortly after the settlement conference, Guenther and Drannan eventually agreed to waive the fees that the trial

---

[8]Allstate elicited testimony that the parties could enter a stipulation to request that the trial court vacate the settlement conference.

[9]The trial court implicitly acknowledged that Allstate's actions had harmed Guenther and Drannan when its sanctions of Allstate included an order that Allstate pay Guenther's and Drannan's attorney fees "incurred in presenting and appearing at the settlement conference."

22

judge had ordered as a sanction for Allstate's conduct because "they were worn out" and simply wanted to "get the case over" by means of a settlement. From this, the jury could have concluded that Guenther and Drannan eventually settled the case for less than it was worth in part because Allstate's conduct at the settlement conference had so demoralized them. The jury could also have concluded that the settlement conference behavior harmed Guenther and Drannan to the extent it caused them inconvenience and frustration. Because we must view the direct and circumstantial evidence in the light most favorable to Guenther and Drannan, see Saucedo, we cannot say the trial court erred when it implicitly rejected Allstate's claim that Guenther and Drannan had presented insufficient evidence on the damage element of the tort.

¶43        In a related argument, Allstate asserts Guenther and Drannan were required to present expert testimony on the reasonableness of Allstate's actions. Although Guenther and Drannan assert that Allstate also waived this argument, Allstate clearly raised it in its motion for JMOL, and we therefore address it.

¶44        Allstate acknowledges that Arizona does not require expert testimony in abuse-of-process claims, but, citing cases such as Yater v. Coy, 681 N.E.2d 232 (Ind. Ct. App. 1997), urges us to adopt such a requirement on the ground that "the reasonableness of litigation practices . . . [is] beyond the common knowledge of most people." Because abuse-of-process claims involve no standard-of-care requirement, because expert witnesses are expensive for plaintiffs to secure, and because a jury is capable of deciding whether a legal process has been primarily used to pursue an improper purpose, we decline Allstate's invitation to require expert testimony to support an abuse-of-process claim. Moreover, we have already concluded that Guenther and Drannan raised a

23

genuine issue of fact on Allstate's reasonableness in defending the underlying litigation. Based on that, we cannot say the trial court erred in denying Allstate's motion for JMOL.

## IV. Exoneration of Gaub

¶45 Finally, Allstate argues the jury's verdict in favor of Gaub required the court to enter a JMOL in its favor. It suggests that Guenther's and Drannan's claims against it were based solely on Gaub's conduct as an agent of Allstate and that, because the jury did not hold the agent liable, it could not hold Allstate liable as the principal. See Ford v. Revlon, Inc., 153 Ariz. 38, 42, 734 P.2d 580, 584 (1987) ("[W]hen the master's liability is based solely on the negligence of his servant, a judgment in favor of the servant is a judgment in favor of the master."). The verdict, however, does no more than indicate the jury believed that Gaub had acted solely on Allstate's direction and that he had not acted with an improper purpose. Allstate attempts to characterize its independent conduct as minimal and asserts that Guenther and Drannan presented no evidence of its independent conduct. But the verdict could have been based on no more than the jury's finding that only Allstate had acted with an ulterior purpose by adopting the MIST policy and by allowing that policy to direct Kopin's and Gaub's actions throughout the litigation. We therefore cannot say the trial court erred in denying Allstate's motion for JMOL on this ground. See id. ("'We recognize that where there is independent negligence on the part of the master, the master may be liable, apart from his derivative liability for his servant's wrongful acts.'"), quoting Torres v. Kennecott Copper Corp., 15 Ariz. App. 272, 274, 488 P.2d 477, 479 (1971).

24

I. Preclusion of "other act" evidence

¶46        Guenther and Drannan contend the trial court abused its discretion in excluding other acts evidence they had offered to show that Allstate's actions had been guided by an ulterior purpose. Relevant other act evidence is generally admissible to show a party's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b), 17A A.R.S.

¶47        Prior to trial, Guenther and Drannan identified 25 witnesses and 204 exhibits they intended to introduce on Allstate's handling of other claims. After Allstate moved to exclude this evidence, Guenther and Drannan apparently "streamlined the witnesses and exhibits" they intended to use during trial. Those witnesses would have testified about other cases Allstate had handled in a fashion that, in Guenther and Drannan's view, displayed Allstate's use of its MIST policies to chill or discourage valid claims. Most of the evidence they proffered related to other MIST cases Allstate had handled in Arizona; one case involved Gaub's behavior in another MIST case. Judge Quigley nonetheless excluded the evidence.

¶48        In arguing that Judge Quigley erred in doing so, Guenther and Drannan place great weight on Arizona case law that confirms the relevancy and potential admissibility of the other acts evidence they proffered here. See Lee v. Hodge, 180 Ariz. 97, 882 P.2d 408 (1994); Hawkins v. Allstate Ins. Co., 152 Ariz. 490, 733 P.2d 1073 (1987). Although we agree that the proffered evidence was both relevant and probative of various issues litigated at trial, the judge did not preclude that evidence on relevancy grounds. Instead, he precluded the evidence on the ground that its probative value was outweighed by its potential for prejudice. See Ariz. R. Evid. 403 (court

may exclude relevant evidence if evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

¶49        In support of the ruling, Allstate argues that the other acts evidence had the potential to mislead and confuse the jury and would have required the court to "conduct a series of mini-trials" on the details of the other cases. Allstate contends these minitrials could have distracted the jury from appropriately focusing on the underlying case and would have resulted in an unnecessarily lengthy trial. Allstate also asserts that one of the other acts by Allstate involved a case in which a woman had lost an unborn child in an accident, evidence which, in its view, could have inflamed the passions of the jury.

¶50        Allstate maintains that the risks of unfair prejudice, delay, and jury confusion outweighed the probative value of the evidence in question, and asserts the evidence merely proved a point about which there was no meaningful dispute. Allstate did not dispute that it had litigated the underlying case against Guenther and Drannan in an aggressive manner pursuant to its MIST policy. Nor did it dispute that it continued to apply its MIST policy in other cases.

¶51        Guenther and Drannan counter that the probative value of the evidence was substantial and its prejudicial impact minimal. They argue that the evidence would have established that Allstate had an institution-wide, improper motive in litigating MIST cases; demonstrated that Gaub's behavior in their underlying case was not an isolated mistake; demonstrated a pattern of conduct by Allstate relevant to their request for punitive damages, see Hawkins, 152 Ariz. at 497, 733 P.2d at 1080; and rebutted Allstate's own "other case" evidence, which Allstate had presented to show that its MIST program was designed to pursue the legitimate purpose of settling claims in

26

conformity with their actual fair value. As a whole, Guenther and Drannan maintain that Judge Quigley's ruling prevented them from proving essential elements of their case.

¶52 Guenther and Drannan also assert that Allstate's claimed fear about the necessity of minitrials is exaggerated. They note that they had intended to present most of the "other case" evidence through the testimony of one witness, an attorney who had litigated a large number of Allstate MIST claims through arbitration and trial. They argue that Allstate could have appropriately rebutted their evidence by having its defending attorney explain its actions in the other cases.

¶53 The balancing of factors under Rule 403 "is peculiarly a function of trial courts, not appellate courts." Yauch v. S. Pac. Transp. Co., 198 Ariz. 394, ¶26, 10 P.3d 1181, ¶26 (App. 2000); see also Readenour v. Marion Power Shovel, 149 Ariz. 442, 449-50, 719 P.2d 1058, 1065-66 (1986). We thus evaluate Judge Quigley's decision to preclude the evidence for an abuse of discretion. See Readenour, 149 Ariz. at 450, 719 P.2d at 1066. Although the judge did not elaborate on his reasoning process in precluding the evidence, he specifically found that it had limited probative value that was "far outweighed" by its unfair prejudicial effect. While reasonable minds might disagree with Judge Quigley's assessment that the probative weight of the precluded evidence was limited, we cannot conclude that he abused his discretion in precluding the evidence, given the arguments presented on both sides of the question.

¶54 Guenther and Drannan also contend Judge Veliz, who was next assigned the case, erroneously considered Judge Quigley's ruling as the law of the case. Judge Veliz did exhibit some reluctance to reverse Judge Quigley's order on the ground it was "the law of the case." But he also showed a willingness to analyze the evidentiary arguments independently. Notably, Judge Veliz

27

admitted additional portions of Judge O'Neil's order, thus modifying Judge Quigley's prior ruling. Overall, we conclude that Judge Veliz struck an appropriate balance of trial flexibility and respect for the rulings of the prior judge in the case. Compare Hibbs v. Calcot, 166 Ariz. 210, 214, 801 P.2d 445, 449 (App. 1990) ("[O]ne trial judge should not reconsider the decision of another in the absence of new circumstances."), with United States v. Bensimon, 172 F.3d 1121, 1127 (9th Cir. 1999) (trial judge may change ruling on motions in limine at trial because testimony may bring facts to judge's attention not anticipated at time of original ruling).

II.  Motion to produce

¶55        Allstate presented the testimony of economist Price Fishback to rebut Guenther and Drannan's allegations that, in handling MIST claims, Allstate had made "low-ball offers" and taken unjustified appeals from arbitration awards. Fishback testified that he had designed a statistical study of the relationship between Allstate's offers in MIST cases arising in Southern Arizona and the ultimate jury awards in those cases. In doing so, Fishback relied on figures in the Trial Reporter Compendium, a publication listing completed jury trial information that includes the amounts of jury awards, arbitration awards, plaintiffs' demands, and defendants' offers. To help convey his results to the jury, Fishback used a series of charts. Guenther and Drannan argue that, pursuant to Rule 1006, Ariz. R. Evid., the trial court erred in denying their motion to produce the Allstate claims files that formed the basis of the Trial Reporter's information. They essentially argue that Rule 1006 required Allstate to produce entire claims files because information from them had been used to generate the Trial Reporter listings. We review de novo the meaning and effect of a court rule. Perguson v. Tamis, 188 Ariz. 425, 427, 937 P.2d 347, 349 (App. 1996).

28

¶56    Rule 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

In other words,

> [a] witness may summarize the information contained in voluminous reports or records as long as the information contained in the documents would be admissible and the documents are made available to the opposing party for their inspection. Rule 1006 . . . authorizes the use of summaries when the contents of "voluminous writings" cannot be conveniently examined in court.

Rayner v. Stauffer Chem. Co., 120 Ariz. 328, 333-34, 585 P.2d 1240, 1245-46 (App. 1978) (citations omitted). The parties agree that the purpose of Rule 1006 is to give parties an opportunity to detect and prepare for inaccurate summaries. See Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1259 (9th Cir. 1983).

¶57    But the record reflects that Allstate produced all the information on which Fishback relied, and Guenther and Drannan do not suggest otherwise. Fishback admitted he had asked Allstate for its claim files to verify the information contained in the Trial Reporter. An Allstate employee apparently generated the relevant excerpts from those claims files, and Allstate produced those excerpts for Guenther's and Drannan's review. Allstate's efforts fell within the express scope of Rule 1006. Guenther and Drannan were consequently afforded the opportunity to challenge the data contained in Fishback's charts. The cases upon which they rely do not suggest otherwise and, in fact, are limited to discussions about the information used to prepare summaries. See, e.g., United States v. Miller, 771 F.2d 1219, 1238 (9th Cir. 1985) (government's failure to produce

29

records before offering summary into evidence rendered summary inadmissible); Hackett v. Housing Auth., 750 F.2d 1308, 1312 (5th Cir. 1985) (summary inadmissible for failure to produce underlying records when underlying records no longer existed); United States v. Seelig, 622 F.2d 207, 214-15 (6th Cir. 1980) (admission of charts erroneous because government failed to produce underlying records).

¶58        Guenther and Drannan suggest we should read Rule 1006 as requiring Allstate to produce collateral information with which they could have attacked Fishback's opinions. But, our review of the trial court's ruling is limited to determining the scope of production required by Rule 1006. Although Guenther and Drannan might have been entitled to additional production under Rule 26(b)(1), Ariz. R. Civ. P., 16 A.R.S., Pt.1, they do not present that issue on appeal. Their arguments rely exclusively on case law interpreting Rule 1006 and the contents of that rule. Under this limited inquiry, we find no error.

III.  Redaction of Judge O'Neil's sanction order

¶59        Guenther and Drannan next challenge the trial court's redaction of Judge O'Neil's sanction order. A trial court has broad discretion in the admission of evidence, and we will not disturb its decision absent an abuse of that discretion and resulting prejudice. Gemstar Ltd. v. Ernst & Young, 185 Ariz. 493, 506, 917 P.2d 222, 235 (1996). Following the mandatory settlement conference in the underlying personal injury action, Judge O'Neil issued a minute entry order sanctioning Allstate. That order included the following passage:

> Initially the Court notes the order of January 14 ordered that "the parties shall exchange the [pretrial conference] memorand[a] with each other or with the consent of all parties, furnish the memoranda sealed to the Court." . . . It appears [defendant Allstate failed to send its memorandum] to Plaintiff as required under the scheduling order.

Further, the Defendant's statement states photos and IME reports and a bio-mechanical report are attached. No such statements are supplied to the Court and upon inquiry during the settlement conference, Defendant did not have present with him such attachments.

. . . .

. . . The Court finds Defendants and counsel failed to participate in good faith in settlement negotiations and the Court, pursuant to Rule 16(f), [Ariz. R. Civ. P., 16 A.R.S., Pt. 1,] does issue sanctions against Defendants as follows.

. . . .

This Court is well aware that sanctions issued under Rule 16 are to be "appropriate" and "just." . . . Several factors loom large in this Court's decision to issue the sanctions it has. First, in discussing the potentiality of settlement, counsel stated, "the insurance company has decided to draw a line in the sand on all cases like this." . . . [T]he Court then posed the question, "Am I to understand that nothing I might say or point out to you would have any impact on your decision to consider settlement or not?" The answer to the Court's question was "yes." . . .

Counsel acknowledged during the joint settlement conference that there is no allegation of [contributory] negligence by Plaintiff or anyone else. Both were affirmatively alleged by Defendants in their answer. Procedurally the outline of the case, as has been pointed out in this minute entry, has appeared to be a war of attrition rather than any reasonable attempt to discuss the merits of the case. . . . [Furthermore, by trying to have Guenther and Drannan's attorney stipulate to cancel the settlement conference,] Defendants made clear that it was their intent to derail the Court's directive to appear and participate in good faith negotiations and settlement nearly immediately after the Judge's order calling for such conference.

The other primary factor preceding the final "straw" is that counsel's and perhaps Defendants' decision to not participate [to] a meaningful extent was made clear that there was no discussion of any kind between counsel, the insurance adjuster or the Defendant at the conclusion of the Court's remarks. Those remarks included an inquiry as to whether the expert, Dr. LaWall, would in fact present

31

> testimony "to attack the necessity of treatment . . . ." The response was that the doctor would testify with specificity that [Drannan], who the Defendants concede was six months pregnant at the time of the accident, should never have sought a medical exam of any kind. It was at this point the Court inquired why the pretrial settlement memorandum did not contain the doctor's report as was referred to within their memorandum and a concession was made that the doctor had not opined that no medical exam would be needed.

Judge Quigley excluded this portion of the order on Allstate's motion, ruling it was inadmissible hearsay and allowing Guenther and Drannan to introduce a redacted version showing that Judge O'Neil had sanctioned Allstate.

¶60        Any out-of-court statement offered to prove the truth of the matter asserted is hearsay. Ariz. R. Evid. 801(c). The excluded portions of the order that Guenther and Drannan had hoped to introduce consist of Judge O'Neil's observations about the settlement conference. Guenther and Drannan contend the excluded portions were admissible because they were offered to show the effect they had had on Allstate's witnesses, to prove Judge O'Neil's state of mind, and to show Allstate's knowledge of Gaub's "improper conduct at the settlement conference" and its subsequent refusal to either change the MIST policy or reprimand Gaub. Guenther and Drannan also argue that Judge Veliz erred in denying their motion to admit the entire order, in which they argued Allstate had opened the door to its admission by misrepresenting the reasons for Judge O'Neil's order.

¶61        Preliminarily, we agree that the contents of Judge O'Neil's order should not have been barred on the ground that the order is hearsay, given the nature of the issues litigated at trial. The contents of that order were not offered for the truth of the matter asserted but, rather, for their effect on Allstate and its employees in causing Allstate to settle Guenther's and Drannan's claims

32

and Allstate's reaction to Gaub's behavior in light of that order. See Pub. Serv. Co. of Okla. v. Bleak, 134 Ariz. 311, 320, 656 P.2d 600, 609 (1982) (words offered for effect on listener "are not within the proscription of Ariz. R. Evid. 802, since they are not offered for a hearsay purpose").

¶62       We also agree that the effect of Judge O'Neil's order on Allstate was relevant to the issue of punitive damages. "Evidence is properly considered by the trier-of-fact in assessing punitive damages if it bears on the purpose and function of punitive damages." Hawkins, 152 Ariz. at 497, 713 P.2d at 1080. Our supreme court has observed:

> Another category of relevant evidence [as to punitive damages] is the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred, from the defendant's conduct. . . . The duration of the misconduct [and] the degree of defendant's awareness of the harm or risk of harm . . . are elements to consider in judging the reprehensibility of the defendant's conduct.

Id. (citations omitted; emphasis added). Thus, the details of Judge O'Neil's order were relevant to the issue of Allstate's awareness of the risks of harm to claimants posed by its aggressive litigation strategy in MIST cases.

¶63       Allstate counters that Judge Quigley addressed this ground of admissibility by allowing Guenther and Drannan to introduce a redacted form of the order that showed the sanctions imposed but not the basis for those sanctions. But the jury could not possibly evaluate how Allstate should have reacted to the sanctions in the context of its MIST policy without knowing the details of the judge's complaints about Allstate's conduct.

¶64       Indeed, the record suggests that Allstate did consider the details of that order in its internal discussions about Guenther's and Drannan's claims. Allstate held a round-table discussion

33

on the order, and adjuster Kopin made an entry in her claim log that the order "has to be read to be appreciated." Notwithstanding the contents of Judge O'Neil's order, Allstate continued to use a modified version of the MIST policy, and Gaub never suggested he had changed his conduct as a result of being sanctioned. To the contrary, Allstate rewarded Gaub for his trial work on its behalf shortly after the sanction order was entered. In essence, Guenther and Drannan argue that Allstate's unwillingness to adjust its policy or to discipline Gaub in light of Judge O'Neil's order demonstrates Allstate's overall willingness to use the judicial process as a weapon. In light of our supreme court's discussion of relevancy in the context of punitive damages, see Hawkins, we conclude Guenther and Drannan were entitled to make this argument to the jury.

¶65        Although we conclude the contents of Judge O'Neil's order should not have been precluded as hearsay, this does not end our discussion. Judge Veliz independently and repeatedly assessed the admissibility of that evidence during the ebb and flow of trial under Rule 403, Ariz. R. Evid. We review for abuse of discretion his rulings refusing to admit an unredacted order. See Yauch; Readenour.

¶66        The record shows that the trial court carefully considered the probative value and prejudicial effect of the order in the context of the trial testimony presented and the issues litigated. In so doing, the court was entitled to consider the unique prejudicial effect of admitting the statements and findings of a trial judge that were directly critical of Allstate on the underlying facts in dispute. See Nipper v. Snipes, 7 F.3d 415, 418 (4th Cir. 1993) (jury would likely give undue weight to judicial findings because, "by virtue of having been made by a judge," they would create a "serious danger of unfair prejudice"). The court was also entitled to consider whether a curative instruction (which would have told the jury not to consider Judge O'Neil's order "for the truth of

34

the matter asserted") would adequately protect Allstate. Further, the exclusion of the text of Judge O'Neil's order did not prevent Guenther and Drannan from eliciting testimony from Allstate's employees and its own witnesses about the actual behavior of Gaub and Allstate during the settlement conference and thereafter. Indeed, Guenther and Drannan vigorously cross-examined Gaub about his actions at the settlement conference and thereby referred to each of Judge O'Neil's specific complaints about Gaub's behavior.

¶67    At the conclusion of nearly all the testimony, Judge Veliz admitted an additional portion of Judge O'Neil's order to permit Guenther and Drannan to rebut Allstate's suggestion that it had been sanctioned merely because it had asserted its right to refuse to settle the case. That portion of the order clarified that the judge had sanctioned Allstate because of its failure to participate in good faith in the settlement conference. However, Judge Veliz also continued to preclude the details of Judge O'Neil's order on the ground that its prejudicial effect outweighed its probative value. In light of a trial court's unique ability to conduct the Rule 403 weighing process in the context of a trial, and given the arguments presented to Judge Veliz, we cannot say that he abused his discretion in so ruling. See Gemstar, 185 Ariz. at 506, 917 P.2d at 235 (trial court accorded substantial discretion in determining admissibility of evidence under Rule 403).

IV. Jury instructions

¶68    Guenther and Drannan next challenge two of the trial court's jury instructions. "A jury instruction need not be a model instruction, as long as it does not mislead the jury when the instructions are read together and in light of each other." Life Investors Ins. Co. of Am. v. Horizon Res. Bethany, Ltd., 182 Ariz. 529, 532, 898 P.2d 478, 481 (App. 1995). We review challenged jury instructions to determine whether the trial court gave the jury "the proper rules of

35

law to apply in arriving at its decision." Durnin v. Karber Air Conditioning Co., 161 Ariz. 416, 419, 778 P.2d 1312, 1315 (App. 1989). "Absent substantial doubt whether the jury was properly guided in its deliberations, we will not overturn a jury verdict because of jury instructions." Terry v. Gaslight Square Assocs., 182 Ariz. 365, 368, 897 P.2d 667, 670 (App. 1994).

¶69 The trial court instructed the jury that "'process,' as used in the tort of 'abuse of process,' encompasses the entire range of procedures authorized by the court which are incident to the litigation process." Guenther and Drannan contend that, by including the term "authorized by the court," the trial court "unduly restrict[ed]" the jury from considering all the evidence. Although, "process" for purposes of an abuse-of-process claim is not confined to the strict legal definition of the word, it is still "'an act done under the authority of the court for the purpose of perpetrating an injustice, i.e., a perversion of the judicial process to the accomplishment of an improper purpose.'" Morn, 152 Ariz. at 167, 730 P.2d at 876, quoting Rondelli v. County of Pima, 120 Ariz. 483, 489, 586 P.2d 1295, 1301 (App. 1978). The authority of the court must have been invoked for a defendant to be liable for an abuse of process. Thus, we do not agree with Guenther and Drannan that the trial court gave an erroneous instruction in defining "process."

¶70 Over Guenther and Drannan's objection, the trial court also instructed the jury that "[f]acts occurring both prior to and after the filing of a formal action and the issuance of process may serve as evidence of motive." Guenther and Drannan had requested an instruction that would have explicitly allowed the jury to consider Allstate's prelitigation conduct in assessing its liability as well as its motive. As we stated in Morn, "'it is what is done in a course of negotiation, rather than the issuance of any formal use of the process itself, which constitutes the tort.'" Id. at 168, 730 P.2d at 877, quoting Keeton, supra, § 121, at 898. But that statement was made in the context

36

of the counterdefendants' argument that the counterclaimants had presented no evidence of improper purpose. Therefore, any implication about whether a party may be liable for abuse of process based on acts occurring before the issuance of process is dictum. Moreover, Guenther and Drannan's assertion is undermined by our additional comment that "'[t]he purpose for which the process is used, once it is used, is the only thing of importance.'" Id. at 167, 730 P.2d at 876, quoting Keeton, supra, § 121, at 897 (emphasis added). Because Morn is, at best, ambiguous on the question of whether a defendant can be liable for prelitigation conduct in an abuse-of-process claim, we cannot say the trial court erred by not amplifying its jury instructions to accommodate Guenther and Drannan's request. Finally, we note that the instruction given did not in any fashion limit the jury from considering Allstate's motives before litigation began, and the jury ultimately found Allstate liable for abuse of process.

¶71         Affirmed.


                                              _____
                                              PETER J. ECKERSTROM, Judge

CONCURRING:


_____
PHILIP G. ESPINOSA, Chief Judge


_____
JOHN PELANDER, Presiding Judge