NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

SERAH E., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, I.P., A.P., *Appellees.*

No. 1 CA-JV 18-0488
FILED 11-26-2019

Appeal from the Superior Court in Maricopa County
No. JD32095
The Honorable Jeanne M. Garcia, Judge

**AFFIRMED**

COUNSEL

Gillespie Shields Goldfarb Taylor & Houk, Phoenix
By Kristina B. Reeves, April Maxwell
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee, Department of Child Safety*

---

## MEMORANDUM DECISION

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Jennifer M. Perkins and Judge David D. Weinzweig joined.

---

**H O W E**, Judge:

¶1            Serah E. ("Mother") appeals the juvenile court's order terminating her parental rights to I.P. and A.P. on the grounds of chronic substance abuse under A.R.S. § 8–533(B)(3) and time in an out-of-home placement under A.R.S. § 8–533(B)(8)(c). For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2            We view the facts in the light most favorable to sustaining the juvenile court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016). Mother has an eight-year history of substance abuse, including prior abuse of prescription pills, marijuana, heroin, and methamphetamine. Mother and Jake P. ("Father")[1] are the natural parents of I.P., born January 2014, and A.P., born March 2015. In February 2016, the Department of Child Safety took custody of the children and petitioned for dependency, alleging that the parents were abusing methamphetamine and lacked stable employment and housing. The Department was also concerned that Mother had mental health issues that she was not treating. The court found that the children were dependent with respect to both parents and set a case plan of family reunification.

¶3            The Department provided Mother with reunification services, including substance-abuse testing and treatment, a psychological evaluation, and a parent aide. She consistently participated in services and obtained housing. Mother also stated she was employed but did not provide any pay stubs to the Department.

¶4            Mother regularly tested negative for drugs in 2016 and graduated to recovery maintenance in her treatment plan. In June, Mother

---

[1]        The juvenile court terminated Father's parental rights to I.P. and A.P., and he is not a party to this appeal.

completed a psychological evaluation with Dr. Karen Mansfield-Blair. Dr. Mansfield-Blair diagnosed Mother with unspecified anxiety and depression disorders and a severe amphetamine-use disorder in early remission. She gave Mother a guarded prognosis of her ability to safely parent the children and noted that the children's safety is directly related to her ability to maintain sobriety and treat her mental health. Mother successfully completed individual counseling and the parent-aide service. As a result, the court returned the children to Mother's physical custody in December 2016 and ordered her to participate in a family reunification team.

¶5            Unbeknownst to the Department, however, Mother had relapsed a few months before on methamphetamine and used baking soda to falsify her drug tests. She checked herself into a hospital in February 2017 for suicidal ideations, leaving the children with a relative whose children had substance-abuse issues and who had not been approved by the Department to care for them. At this time, Mother also tested positive for methamphetamine, and the Department reclaimed custody of the children. Mother initially denied that she had used methamphetamine but later admitted it. After her release from the hospital in February 2017, Mother completed a 30-day substance-abuse rehabilitation program.

¶6            The Department then referred Mother for drug testing and a second parent-aide and asked her to self-refer for more counseling services. Mother remained engaged with substance-abuse treatment and counseling. She also began the "Bridges to Hope" program for homeless mothers, which provided her with housing and employment assistance and mentoring services.

¶7            Mother's drug tests continued to raise questions in 2017, when she submitted four diluted tests. In May, the court changed the case plan to termination and adoption. The Department moved to terminate Mother's parental rights to the children under the substance-abuse ground and later amended the motion to include the fifteen-month out-of-home placement ground. Mother submitted two more diluted tests in 2018. Four of the six tests were provided late on the second day of surprise back-to-back drug tests, where Mother had tested negative on the first day.

¶8            Mother also completed a psychological evaluation with Dr. James Thal. Dr. Thal diagnosed her with unspecified social anxiety and depressive disorders and amphetamine use disorder in sustained remission. Dr. Thal noted Mother's progress in services and found she had basic parenting skills. He nevertheless gave a guarded prognosis of

Mother's ability to safely parent the children, noting that she would need to remain sober for at least one year and that she remained at "considerable risk for relapsing" due to her lengthy history of substance abuse.

¶9            The juvenile court held a contested termination hearing over four days. At that hearing, the Department offered two witnesses who testified about Mother's diluted drug tests. As relevant to Mother's appeal, the case manager testified that she had over four years' experience overseeing urinalysis testing as a case manager and an adult probation officer. She testified that diluted tests reflect attempted falsification by the test-taker.  Given Mother's history, she also advised Mother how to avoid diluted test results, telling her to limit fluid intake and drop the sample "first thing in the morning." Mother ignored this advice and would submit diluted samples in the late afternoon.

¶10          Dr. Bert Toivola, a clinical toxicologist, testified that "[m]ethamphetamine . . . has a very, very short window of detection[,] . . . [p]robably no more than two to three days. . . .  Someone who didn't use as much meth and had a diluted sample, you may not pick it up at all.  That's . . . the whole point of dilute specimens . . . is the interpretation of negative results in a dilute sample." He added that a diluted test result may be obtained in only two ways: "ingestion of a large amount of fluid prior to collection" or "the addition of water to the specimen post collection."

¶11          Dr. Toivola personally analyzed Mother's diluted samples and testified that although they were "diluted negative," dilution invalidated their interpretation. He explained that dilution masks drug use—making it an effective method of obtaining negative test results even after using drugs.  He noted that diluted urinalysis samples are common among drug users, and mentioned a study that noted that of thousands of "normal people" who were "not being drug tested," "less than 1 percent of those sampled were dilute[,]" whereas the "dilute percentage" among those who are being drug tested was 8.5 percent.

¶12          Mother cross-examined Dr. Toivola but did not present rebuttal expert testimony or attempt to explain why her tests were diluted. Mother testified that she does not drink excessive amounts of water but suggested the dilution may be caused by medication she was taking that acted as a diuretic. Mother's family nurse practitioner also wrote a letter stating that the medication "contributes to [a] diluted sample as a side effect of the medication."

¶13 Dr. Toivola testified, in contrast, that although Mother's medication causes more urine output, it does not alter the concentration of creatinine in the urine, which determines whether a sample is diluted. He therefore concluded that the medication, by itself, would not have caused Mother's diluted samples. He also ruled out everyday situations such as drinking water after exercising.

¶14 The court terminated Mother's parental rights on the grounds alleged, finding that Mother had still "not remedied her substance abuse problem for the lengthy period recommended by Dr. Thal" and that the Department's "concern that Mother will again relapse when faced with the rigors of day-to-day parenting of two young children, including providing a safe home, is well founded." Mother timely appealed.

## DISCUSSION

### 1. Constitutional Issues

¶15 For the first time on appeal, Mother challenges both A.R.S. § 8–533(B)(3), the substance-abuse ground, and A.R.S. § 8–33(B)(8)(c), the fifteen-month out-of-home placement ground, as facially unconstitutional under the federal and Arizona constitutions. She contends that the statutes do not comport with substantive due process because neither requires a finding that the parent is unfit at the time of termination. For the same reasons, she argues that A.R.S. § 8–533(B)(8)(c) is over-inclusive and unconstitutionally vague.

¶16 Mother's claims are waived, however, because she did not raise them with the juvenile court. *See Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 503 (1987) (arguments raised for the first time on appeal, including constitutional challenges, may be waived). We are particularly reticent to examine Mother's constitutional arguments because she has created no record upon which to assess the constitutional firmness of the statutes. *See State v. Brita*, 158 Ariz. 121, 124 (1988) ("It is highly undesirable to attempt to resolve issues for the first time on appeal, particularly when the record below was made with no thought in mind of the legal issue to be decided."). Her failure to raise the issue below also prevented the State from developing and presenting the facts and circumstances needed to assess an issue of constitutional magnitude. Therefore, we decline to address Mother's constitutional arguments.

**2. Statutory Ground for Termination**

**¶17**        Mother challenges the juvenile court's termination order under the fifteen-month out-of-home placement ground, arguing that insufficient evidence supports the court's findings that she was unable to remedy the circumstances causing the children's out-of-home placement and that a substantial likelihood existed that she would not be capable of exercising proper and effective parental care and control in the near future.[2]

**¶18**        A juvenile court's termination decision is reviewed for an abuse of discretion. *Mary Lou. C. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004). "When the statutory grounds for termination are challenged, we will affirm a termination order unless we must say as a matter of law that no one could reasonably find the evidence supporting statutory grounds for termination to be clear and convincing." *Donald W. v. Dep't of Child Safety,* 247 Ariz. 9, 14 ¶ 25 (App. 2019) (quoting *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93 ¶ 18 (App. 2009). Because the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334 ¶ 4 (App. 2004), we view the evidence and draw all reasonable inferences from it in the light most favorable to sustaining the court's decision. *Jordan C.*, 223 Ariz. at 93 ¶ 18.

**¶19**        To terminate parental rights, the juvenile court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination and find by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). As pertinent here, to terminate parental rights for 15 months' out-of-home placement, the juvenile court must find that (1) the child has been in an out-of-home placement for a cumulative total period of fifteen months or longer, (2) the Department made diligent efforts to provide appropriate reunification services[3], (3) the parent has

---

[2]        Because we find that the juvenile court did not abuse its discretion in terminating Mother's parental rights under the 15 months' out-of-home placement ground, we need not address the substance-abuse ground. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 3 (App. 2002).

[3]        Mother concedes that the Department presented sufficient evidence to meet this element before the case plan changed to termination and adoption. In a separate section of her opening brief, Mother argues that the Department reduced her visits with the children and denied her

been unable to remedy the circumstances that caused the out-of-home placement, and (4) a substantial likelihood exists that the parent will be incapable of exercising proper and effective parental care and control in the near future. A.R.S. § 8–533(B)(8)(c); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288 ¶ 41 (2005).

**¶20**    The Department removed the children because Mother was abusing drugs for several years and later admitted that she was using methamphetamine daily, "just like someone who has a cup of coffee in the morning to get going[.]" Mother also lacked stable housing or employment and was not treating her anxiety and depression. Although Mother participated in services, she relapsed in September 2016. She did not notify the Department or reach out for support with her addiction, and she continued using methamphetamine after the children had been returned to her care. Given these facts, Mother concedes that she was unable to remedy her substance-abuse issues before February 2017 but argues that she remained sober after February.

**¶21**    The record includes sufficient evidence to find that Mother was unable to remedy her substance abuse after February 2017. Just as Mother had cheated on the tests before by using baking soda to alter the test results, Mother diluted her urine samples six times between May 2017 and June 2018, which Dr. Tiovola explained created uncertainty about whether those results were reliably negative. Four of the diluted samples were provided on the second day of surprise back-to-back drug tests where Mother tested negative the previous day. And she delivered these samples late on the second day.  The reasonable inference from this evidence is that Mother used methamphetamine after the testing on the first day and then ingested fluids on the second day after learning about the surprise test— causing her to submit diluted urine samples late in the day.

**¶22**    Mother also offered no scientifically credible explanation for the diluted tests. She merely blamed her diluted samples on her prescription medication and being "well-hydrated." Dr. Toivola rejected her explanation, explaining that a diluted test would not result from

---

unsupervised visits, effectively failing "to make any efforts that would enable it to evaluate Mother's progress." The record shows, however, that even after the case plan changed, the Department evaluated Mother's progress during visits and provided reports to the court about those evaluations. At the termination hearing, the case manager testified about Mother's participation in visits, and she did not recommend increased visits because of Mother's diluted drug tests.

drinking water after exercising or spending time in the Arizona heat. Additionally, he opined that Mother's medication could not have caused her to produce such diluted urine and pointed out that if Mother's medications were in fact causing her to submit diluted samples, she would submit the same result as long as she was on the medication. Notably, however, she submitted numerous tests while on the medication with valid creatinine levels and two of her six diluted samples were submitted several months after she stopped taking the medication. The diluted tests show that Mother had not stopped using methamphetamine.

¶23        Although Mother presented evidence that she had a negative hair follicle test in August 2018, such tests do not disprove the "light and sporadic use" that the Department alleged in this case. Based on this evidence, the trial court could have reasonably determined by clear and convincing evidence that Mother had not remedied her substance-abuse issues. *See Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377 ¶ 16 (App. 2010) (finding that drug use need not be constant to be considered chronic).

¶24        The evidence also reflects a substantial likelihood that Mother will not be capable of exercising proper and effective parental care and control in the near future. As discussed, Mother was unable to remedy her substance-abuse issues. Her last diluted test occurred in June 2018, only four months before the final date of the termination hearing. At the hearing, Dr. Thal testified Mother needed to demonstrate at least a year of sobriety. He opined that the diluted tests are a "major issue" and if they could not be adequately explained, he would give Mother a "poor prognosis" of her ability to parent. The case manager also testified about various ways substance abuse can affect Mother's ability to safely parent. She concurred that the children would still be at risk in Mother's care.

¶25        The court also heard evidence that Mother uses drugs when stressed and that her commendable sobriety at the severance hearing was achieved in a stress-free environment.  In particular, Mother was immersed in the Bridges to Hope program—a very structured, stress-free environment in which Mother paid almost no rent and had several mentors. Mother obtained full-time employment in July 2018, just three months before the termination hearing concluded. She was eligible to remain with Bridges for another year and testified that she would stay until she is ready to look for her own place.

¶26        Given Mother's trigger of stress, Dr. Thal and the case manager reported concerns about her ability to remain sober and maintain

housing and employment once the Bridges to Hope program concluded. As Dr. Thal testified,

> Bridges to Hope . . . is, of course, a major support system for [Mother] providing her with shelter at the present time and emotional support and guidance. And the . . . absence of that organization . . . would create an enormous void in [her] support system. So . . . the issue becomes how . . . does she fill that void and is she able to . . . continue her recovery and function successfully without . . . that agency.

This evidence supports the court's finding that Mother was "still working on" establishing stable housing and employment. To be sure, the record includes evidence for and against termination, but the juvenile court has the duty as fact finder to resolve any conflicts in the evidence. *See Oscar O.*, 209 Ariz. at 334 ¶ 4.

### 3. Best Interests

¶27 Mother briefly challenges the court's best-interests finding, arguing she is a fit parent. Once the court finds a parent unfit under at least one statutory ground for termination, "the interests of the parent and child diverge[,]" and the court proceeds to balance the unfit parent's "interest in the care and custody of his or her child . . . against the independent and often adverse interests of the child in a safe and stable home life." *Kent K.*, 210 Ariz. at 286 ¶ 35. "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148 ¶ 1 (2018). Relevant factors to consider in this determination include whether the current placement is meeting the child's needs, an adoption plan is in place, and if the child is adoptable. *Demetrius L.*, 239 Ariz. at 3–4 ¶ 12.

¶28 Here, the court found that although Mother loves her children, she was unable to provide for their needs because of her inability to remedy her substance-abuse and stability issues. Reasonable evidence supports this finding. The court also found that the children would benefit from severance. They had been in an out-of-home placement for about two and a half years and could achieve permanency with their foster family. The

children were thriving in their foster parents' care, and the family was providing for their needs and wished to adopt them.

### 4. Ineffective Assistance of Counsel

¶29 Finally, Mother argues that her counsel provided ineffective assistance by failing to raise the arguments raised on appeal in juvenile court and by failing to introduce certain witnesses and exhibits favorable to Mother. Mother's argument fails because she never shows how counsel's performance fell below prevailing professional norms or how a reasonable probability exists that if not "for counsel's errors, the result of the proceeding would have been different." *John M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 320, 323 ¶ 8 (App. 2007) (ineffective assistance claim must establish both deficient performance and prejudice).

### CONCLUSION

¶30 For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA